SAMUEL SEELEY, plaintiff in error, *v.* WILLIAM PETERS, de-
fendant in error.

*Error to Peoria.*

The Common Law requiring the owner of cattle, hogs, &c. to keep them upon
    his own land, has never been in force in Illinois.
In order to maintain an action for the trespass of cattle upon one's close, the
    owner of the close must have it surrounded by a good and sufficient fence.
There is no general law in Illinois prohibiting cattle from running at large in the
    highway.

TRESPASS, originally brought before a justice of the peace
of Peoria county by the defendant in error against the plain-
tiff in error, by whom a judgment for costs was rendered
against the plaintiff.    An appeal was taken to the Circuit
Court, where the cause was tried before the Hon. John D.
Caton and a jury at the May term, 1847, and a verdict and
judgment rendered for the plaintiff for $4·10.

The material facts, and the instruction of the Court ex-
cepted to, will be found in the Opinion of this Court.

*T. Ford,* for the plaintiff in error.

*W. H. Herndon,* for the defendant in error.

1.    By the Common Law all persons were bound to keep
up their own cattle, and if they went upon the grounds of

Seeley *v.* Peters.

others the owners were liable in damages, unless the owners of the cattle could show that the lands trespassed upon should have been fenced either by prescription, agreement, or assignment. *Little* v. *Lathrop*, 5 Greenl. 356 ; *Wells* v. *Howell*, 19 Johns. 385 ; *Avery* v. *Maxwell*, 4 N. Hamp. 36 ; *Stafford* v. *Maxwell*, 3 Hill's (N. Y.) R. 38 ; *Lyman* v. *Gibson*, 18 Pick. 423 ; *Chambers* v. *Matthews*, 3 Harr. (N. J.) R. 368 ; *Bush* v. *Brainard*, 1 Cowen, 79 ; *Melody* v. *Reab*, 4 Mass. 471 ; *Rust* v. *Low*, 6 do. 90; *Holiday* v. *Marsh*, 3 Wend. 142 ; *Stackpole* v. *Healy*, 16 Mass. 33 ; 3 Kent, 438-9.

2. We brought the Common Law with us from England and have adopted it by express statute. Rev. Stat. 337, § 1 ; 1 Kent, 472 ; 2 do. 28.

3. There the Common Law is the law of the land unless expressly repealed by legislative provisions, and the same is not repealed by implication or doubtful suspicion. *Stafford* v. *Ingersoll*, 3 Hill's (N. Y.) R. 38 ; *Stackpole* v. *Healy*, 16 Mass. 36 ; *Melody* v. *Reab*, 4 do. 471 ; 1 Kent, 464 ; 2 do. 28.

4 Now, have our statutes concerning inclosures and fences repealed the Common Law? They have not. They have only given a cumulative remedy. Rev. Stat. 280, 281, §§ 13-18 ; 3 Black. Com. 8, 9 ; 2 Tucker's Com. 5 ; *Hooper* v. *Kittridge*, 16 Verm. 677 ; *Stafford* v. *Ingersoll*, 3 Hill's (N. Y.) R. 38-41 ; *Clark* v. *Brown*, 18 Wend. 220.

5. Five States, viz: Massachusetts, New York, New Jersey, New Hampshire and Maine, where they have similar statutes to our own, have all decided in most emphatic language that the insufficiency of fences is no defence for the defendant, unless in case of partition fences and then only under some circumstances. *Stackpole* v. *Healey*, 11 Mass. 36 ; *Little* v. *Lathrop*, 5 Greenl. 356 ; *Chambers* v. *Matthews*, 3 N. J. 368 ; *Stafford* v. *Ingersoll*, 3 Hill's (N. Y.) R. 38 ; *Avery* v. *Maxwell*, 3 N. Hamp. 36.

6. If the construction of similar statutes by our sister States is regarded, weighed and followed by this State, and they should be, the Court below committed no error in giving the instructions asked for by plaintiff below, nor in refusing

to give those asked for by defendant below. *Campbell* v. *Quillan,* 2 Scam. 288; *Bond* v. *Appleton,* 8 Mass. 472; *Pennock & Sellers* v. *Dialogue,* 2 Peters, 1; *Stackpole* v. *Healy,* 16 Mass. 36; *Chambers* v. *Matthews,* 3 Harr. (N. J.) R. 368; 3 Kent, 438.

*O. Peters,* upon the same side.

In this case the defendant insists that he is not required by law to fence against the cattle of others running at large, or in the highway; but that if the owner of cattle permits them to escape into another's inclosure, he is liable for any damage they may do; and that the condition o the fence is not a proper subject matter of inquiry, except perhaps, as intimated in one of the instructions in this case, to regulate the amount of damages to be recovered.

To maintain this proposition, we insist:

1. That such was the rule of the Common Law;

2. That the Common Law, in this respect, has been adopted in this State; and

3. That this rule of the Common Law has not been repealed by any statute.

I. By the Common Law, one need not inclose his fields, but they were "bounded by the law;" the law was his fence. 18 Pick. 423; 4 Mass. 471; 15 Johns. 220; 3 Harr. 368; 3 Wend. 33; Salk. 335–6; 3 Hill, 38; 16 Pick. 33; 3 Black. Com. 210; 19 Johns. 385; Chitty, 90; F. N. Brev. 127–8, and Lord Hale's note to that case; 1 Cowen, 79, and note; *Rust* v. *Low,* 6 Mass. 90; 4 New Hamp. 36; *Little* v. *Lathrop,* 5 Greenl. 356; ib. 336; 3 Kent's Com. 438; *Holliday* v. *Marsh,* 3 Wend. 142; *Wells* v. *Howell,* 19 Johns. 384; *Shepherd* v. *Huse,* 12 Johns. 433; 2 Dane's Abr. 658 to 680. Judge Dane, in this article on fences, has very fully discussed this rule of the Common Law, and collected the authorities.

II. This rule of the Common Law has been adopted in this State. Our Statute (Rev. Stat. p.—) adopts the Common Law, "so far as it is applicable and of a general nature." The Act adopting this, was passed February 4, 1819.

The rule of the Common Law, for which we contend, is of a "general nature;" and it is no less applicable than in numerous other cases, in which it is not doubted that we have adopted it; as in case of frauds, right of way, right of domicil. We shall show that it has been adopted in other—perhaps nearly or quite all of the other States; and that too, under circumstances not essentially different from our own.

Indeed, it is not contended on the other side that this rule of the Common Law was not adopted here, but that it has been repealed by implication, by enactments of the Legislature.

III. We will consider, then, whether this rule of the Common Law has been repealed by any enactments of the Legislature.

And here it will be admitted that there has never been any Act passed, directly repealing it; if it is repealed, it is by implication merely. A law is not to be deemed as repealed by implication, unless the repealing law establishes a new rule, contrary to, or inconsistent with the existing law. The law does not favor repeals by implication, or unless it is clear that some evil is to be remedied. Bac. Abr.

Our statutes no where adopt any such rule to conflict with the Common Law rule. This will be quite apparent by reference to the existing statute laws, and the history of legislation on this subject. All of our existing statute law in relation to fences is embraced in the new Statutes. Rev. Stat. 51, *et seq.*

The first ten sections relate wholly to "common fields." As this was a species of tenure unknown to the Common Law, it became necessary to regulate it by enactments of the Legislature. A similar kind of tenures exists in most of the States, and hence we find most of the States legislating upon it in almost precisely the same manner. In England there was common of turbary, common of piscary, &c. But these were regulated by prescription, and were supposed to lie in grant.

While the first ten sections relate to "common fields" only, the eleventh, twelfth, thirteenth and fourteenth sections relate wholly to partition or division fences. There can be no question as to the eleventh, twelfth and thirteenth sections; the language is too explicit to admit of doubt. And, when the fourteenth section is carefully considered, it will not less clearly relate to the same subject. The former sections provide for the appointment of fence viewers, point out their duties, and define liabilities and obligations of adjacent owners of fields. The fourteenth section then provides, that nothing in the Act shall debar owners from fencing as they please, with walls, &c., to be "subject to all provisions, inspections and restrictions, to which, by that chapter, any other inclosure is made liable," &c. Now, no fences but partition fences are made subject to inspection, &c. This view is confirmed beyond a doubt, when it is considered that this fourteenth section was originally contained in a proviso to the Act of 1819, section three, and that Act clearly related wholly to partition fences.

It is not quite so clear what was the exact meaning of the Legislature in the three next sections, viz: the 15th, 16th and 17th; though it is not less clear that there is no manifest intention to repeal an important principle of the Common Law. It certainly adopts no rule inconsistent with, or contrary to, the Common Law rule.

Sec. 15 declares a well known rule of the Common Law, that the owner of a field shall have his action of trespass against the owner of cattle that break into his inclosure, and no damage, his fence being good, &c. and then superadds a penalty of double damages for all subsequent similar injuries. It is not easy to see how this can be said to operate as a repeal. Sec. 16 provides that the "condition of the fence at the time the injury was committed may be proved on trial." What fence? Can it it be any other than a partition fence? None other has been spoken of; and if there had, this section in no manner indicates that any such proof is to bar the action. It would have said so, if it had been so intended. It probably was intended to regulate the

Seeley *v.* Peters.

amount of damages by the condition of the fence, or perhaps to save from the penalty of double damages, if the fence was insufficient.

The part of this section authorizing three householders to view the fence does not show any thing different from this. It, at most, points out a mode of making evidence for the parties, leaving the effect of the evidence to be determined according to law, but not to bar the action in any event. There is no indication of any such intention.

Section seventeen favors rather than opposes our construction. This prohibits the owner of land from injuring cattle which shall break into his inclosure through insufficiency, and provides for an arbitration, and the amount awarded shall be paid it shall bar any action for damages. These sections undoubtedly did intend to alter the Common Law in one respect, viz: to authorize the person trespassed upon to distrain and impound the cattle at once, without waiting, as at Common Law, till the cattle were levant and couchant.

The three remainining sections (§§ 19, 20 and 21,) concern only fences placed on lands of another by mistake, the mode of correcting the mistake, of running division lines, &c. Here, again, reference is clearly had to adjunct owners, and to partition fences. By what rule of construction is it, that we are to say that in one section the Legislature meant division fences, and in another section another kind of fences, when there is no language used to indicate any such intention?

Section eighteen makes no reference to any kind of fence; "all cattle trespassing" &c. In such case the owner is to be notified; if he neglects to secure them the person trespassed upon may secure them, &c. So that if the owner of cattle, in any case, shall neglect to secure them, he is liable to have them seized. How would the Legislature have provided thus, if they intended to repeal the Common Law, and make it necessary to fence against the open country and highways? But we have the aid of much authority on this question. In Massachusetts, by an Act passed in 1785, ch.

52, (see Mass. Laws, vol. 1, p. 225,) it was provided that four viewers should be elected, and for partition fences.

By their Act of 1788, ch. 65, § 3, it was enacted that a person injured in his tillage should have his action of trespass, he having a legal and sufficient fence. See, also, § 5 of same Act. Sec. 3 of Mass. Act of 1788 is like § 16 of our Acts, ch. 51. The Mass. Acts were re-enacted in the State of Maine after the separation. The Courts of both of those States have given judicial construction to those statutes, and have held that they did not repeal the Common Law. *Rust* v. *Low*, 6 Mass. R. 90; *Little* v. *Lathrop*, 5 Greenl. 356. Other States, where the history of their legislation is similar to our own, are not less explicit in determining that the Common Law is not repealed by implication. *Avery* v. *Maxwell*, 4 N. H. R. 36 ; *Bush* v. *Brainard*, 1 Cowen 78, and a learned note to that case.; 3 Harr. (N. J.) R. 368 ; 16 Mass. 36, before cited ; 4 do. 473 ; 6 do. 90, 40 ; 3 Hill's Rep. 41. The history of the legislation on this subject, in this State, confirms the construction we contend for.

The two first laws relating to fences, were passed on the 19th and 20th of February, 1819, a few days after the Legislature had adopted the Common Law. The Act of February 19th provides :

§ 1. That all fields &c., shall be inclosed with a fence of posts, &c.

§ 2. That if any mare, horse, &c., shall break into any inclosure, the fence being of sufficient height and strength, &c., the owner shall be liable to make good all damages, for the first offence single damages, and ever after double damages.

§ 3. The only remaining section proceeds to regulate partition fences, and contains substantially the provisions of sections 11, 12, 13 and 14, of ch. 51, Rev. Stat.; the proviso of section 3 being the same as section 14.

In 1835, (Session Laws of 1835, p. 144, 505,) the Legislature repealed sections 1 and 2 of the Act of 1819, February 19, and at the same time re-enacted section 2, and enacted four other sections, which are literally the 15th, 16th, 17th and

18th sections of ch. 51, of Rev. Stat., merely making the breaking of cattle through a sufficient fence penal, it could not possibly have been the intention to repeal the Common Law. If it should be said that the 15th, and subsequent sections of our Act use general language, broad enough to embrace all fences, the same, it is answered, is true, of the statutes of New York, Massachusetts, New Hampshire, Vermont, Maine and New Jersey, all of which States have given to their statutes the same construction we contend for here. And it is not easy to see how this Court can consistently adopt a different rule, without wholly disregarding settled rules of construing statutes, and all judicial precedents; not one judicial decision can be found against our construction, but numerous ones in favor of it.

All the arguments used in the argument of this case, as to the condition of the country, its sparse settlements, its waste lands, and the inconvenience of adopting our construction of our statute were pressed upon the Courts in the cases referred to in other States, and yet the Courts there adhered to the wholesome rule of the Common Law.

IV. There is one other question presented by this bill of exceptions, viz: whether the owner of land is required to fence against a public highway.

The bill of exceptions shows that a highway runs along part of the way by the *locus in quo*; thus attempting to draw the inference that the hogs escaped into the field from the highway. The plaintiff in error cannot object to this construction of his bill of exceptions. Then, were his hogs *lawfully* in the highway so as to require that defendant fence against them?

We say the Legislature has no constitutional power to pass such a law.

Section eleven, Article eight of our Constitution declares that no man's property shall be taken for public use without compensation. Section one, of the same Article, declares individual rights, &c.

The Legislature cannot take my property and give it, or its use to another.

In taking my land for a highway, it only takes an easement over it..*i. e.* the right of travel to accommodate the public, and it gains no right to say that A. or B. may take the soil, or herbage, and appropriate it to his own use.  4 New Hamp. 36 ; 16 Mass. 36 ; 3 Hill, 38; 3 Wend. 142 ; 7 New Hamp. 579.

It cannot certainly be contended that the Legislature intended thus, by implication, by the exercise of doubtful constitutional power, to repeal a law, or to take away private rights.   At least, before the Court come to such a conclusion, it should see that such was clearly the intention, and not impute such conduct to the Legislature, by at least a doubtful inference.   Nor ought it to be inferred that the Legislature has given license to depasture lands of another, and to impose onerous duties on the owners of fields, unless the language is most clear and unequivocal.

If the Court should hold that the owner of land is required to fence, other consequences, the most disastrous will ensue. If such shall be the rule, the owner will be subjected to an action for damages that may happen to cattle that shall break in and get damaged, as falling into wells, eating food that is poisonous or hurtful, &c.   The duty to fence, will imply a liability for not fencing effectually.

The Opinion of the Court was delivered by

TRUMBULL, J.   This was an action of *trespass* to personal property, originally commenced by Peters against Seeley before a justice of the peace, and taken by appeal to the Circuit Court.

Upon the trial in the Circuit Court before a jury, Peters "proved that Seeley's hogs had damaged certain wheat in shock in a field belonging to him and closed." "The defendant (Seeley) then proved that the north side of said field, where the hogs got in, was so badly fenced that hogs which were not breachy could go in and out at pleasure, and that said fence was entirely insufficient to turn hogs. Further, that the north side of said field, where said defective fence was, was bounded by unoccupied and unenclosed

prairie, and that a public road passed along said fence at least part of the way on the north side." At the instance of the plaintiff below, the Court instructed the jury: "That if they believe from the evidence, that the defendant's hogs went into the plaintiff's inclosure and did damage to his crops, they will find a verdict for the plaintiff, and assess his damages to amount of the injury actually done, and it matters not what was the condition of the plaintiff's fence, so far as his right to recover some damages is concerned, inasmuch as the owner of a field is not obliged to keep up a fence around his enclosure to keep out his neighbor's cattle or hogs, but the owners of cattle permit them to run at large at their peril." To the giving of which instructions the defendant excepted. The jury found a verdict for the plaintiff below, upon which judgment was entered in his favor.

The errors assigned question the correctness of the instructions of the Circuit Court, which are admitted to have been proper, if the Common Law upon the subject of inclosures prevails in this State ; and to determine whether it does, involves a construction of a part of the 51st chapter of the Revised Statutes, concerning "*Inclosures and Fences.*" In order to a more perfect understanding of that Act, it may be well to advert to its history, for although now consolidated into one Act in the Revised Statutes, it originally consisted of four distinct enactments, passed at different times.

On the 20th of July, 1819, (Laws 1819–23,) an Act was passed regulating inclosures, the first section of which provided "that all fields and grounds kept for inclosure, shall be well inclosed with a fence composed of sufficient posts and rails, posts and palings, palisadoes, or rails alone, laid up in the manner called a worm fence, which posts shall be deep set and strongly fastened in the earth; and all fences composed of posts and rails, posts and palings, or palisadoes, shall be at least five feet in height; and all fences composed of rails, in manner which is commonly denominated a worm fence, shall be at least five feet six inches in height, the uppermost rail of each and every point thereof supported by strong stakes, strongly set and fastened in the earth, so as to

compose what is commonly called staking and ridering, other-
wise the uppermost rail of every pannel of such worm
fence shall be braced with two strong rails, poles, or stakes,
locking each corner or angle thereof," &c.  This section
further provides, that the apertures between the rails or
palings shall not exceed a certain number of inches, and for
the worm of worm fences.  The second section provides,
that the owner of any animal that shall break into any person's
inclosure, the fence being of the height and strength speci-
fied in the first section, and found and approved to be such
by the view of two persons for that purpose appointed by
the County Commissioners, shall be liable to make good all
damages to the owner of the inclosure; for the first offence,
single damages only: and ever afterwards, double the damages
sustained.    The balance of this Act relates to partition fen-
ces.   On the 23d of February, 1819, another Act was pas-
sed, (Laws 1819–37,) regulating the inclosing and cultivating
of common fields.   These Acts were in force in the Indiana
Territory as early as 1807, and before the Territory of Illi-
nois was organized, and they are retained in the Revised
Laws of 1833.

In 1835, January 27, (Gales' Statutes, 278,) an Act was
passed to amend the Act of 1819, *"regulating inclosures."*
The first section of this Act provides as follows : "That if
any horse, mare, gelding, colt, mule, or ass, sheep, lamb,
goat, kid, bull, cow, heifer, steer, or calf, or any hog, shoat,
or pig, shall break into any person's inclosure, the fence
being good and sufficient, the owner of such animal or ani-
mals shall be liable in an action of trespass, to make good
all damages to the owner or occupier of the inclosure, for
the first offence, single damages only, and ever afterwards,
double the damages sustained."

The 2d section provides that the condition of the fence at
the time the trespass was committed, may be proven upon
trial, and also for summoning three householders to view the
fence, whose testimony shall be good evidence touching the
sufficiency thereof.

Section three makes the person injuring animals breaking

Seeley *v.* Peters.

through, for want of a sufficient fence, liable for such injury.

Section four requires notice to be given to the owners of animals trespassing, (if known,) and if they refuse to secure them, authorizes the person trespassed upon to secure and feed them, for which they are to receive a compensation from the owner; and section five repeals the 1st and 2d sections of the Act to which it is an amendment.

In the Revised Statutes of 1845, the three foregoing Acts, and an Act providing for the removal of fences made by mistake on the lands of other persons, constitute but one chapter, the 15th, 16th, 17th, and 18th sections of which are the same as the first four of the Act of 1835, and the balance of the chapter is made up of the other three Acts above referred to, omitting the first two sections of the Act of the 20th of February, 1819, which had been repealed by the Act of 1835.

It is insisted on the part of the defendant in error, that the foregoing statutes create no obligation upon the owner of land to inclose it with a fence if he would protect it against the depredations of cattle or hogs, and to support this view of the case, numerous authorities have been cited to show,

*First:* That by the Common Law, one need not inclose his fields with a fence, and that inasmuch as the Common Law has been adopted in this State, "so far as the same is applicable and of a general nature," that therefore this rule of the Common Law prevails in Illinois ; and

*Secondly:* That similar statutes to those of Illinois have uniformly been held in other States not to change the rule of the Common Law.

Admitting that at the Common Law, the owner of a close was not bound to fence against the adjoining close, except by force of prescription, yet in adopting the Common Law, as was said in the case of *Boyer* v. *Sweet,* 3 Scam. 121, it must be understood only in cases where that law is applicable to the habits and condition of our society, and in harmony with the genius, spirit and objects of our institutions." See also *Penny* v. *Little,* 3 Scam. 301. However well adapted

the rule of the Common Law may be to a densely populated country like England, it is surely but ill adapted to a new country like ours. If this Common Law rule prevails now, it must have prevailed from the time of the earliest settlements in the State, and it can be supposed that when the early settlers of this country located upon the borders of our extensive prairies, that they brought with them and adopted as applicable to their condition a rule of law, requiring each one to fence up his cattle ; that they designed the millions of fertile acres stretched out before them to go ungrazed, except as each purchaser from Government was able to inclose his part with a fence ? This State is unlike any other of the Eastern States in their early settlement, because, from the scarcity of timber, it must be many years yet before our extensive prairies can be fenced, and their luxuriant growth sufficient for thousands of cattle mus be suffered to rot and decay where it grows, unless the settlers upon their borders are permitted to turn their cattle upon them.

Perhaps there is no principle of the Common Law so inapplicable to the condition of our country and people as the one which is sought to be enforced now for the first time since the settlement of the State. It has been the custom in Illinois so long, that the memory of man runneth not to the contrary, for the owners of stock to suffer them to run at large. Settlers have located themselves contiguous to prairies for the very purpose of getting the benefit of the range. The right of all to pasture their cattle upon uninclosed ground is universally conceded. No man has questioned this right, although hundreds of cases must have occurred where the owners of cattle have escaped the payment of damages on account of the insufficiency of the fences through which their stock have broken, and never till now has the Common Law rule, that the owner of cattle is bound to fence them up been suffered to prevail or to be applicable to our condition. The universal understanding of all classes of the community, upon which they have acted by inclosing their crops and letting their cattle run at large, is entitled to no little consideration in determining what the

Seeley *v.* Peters.

law is, and we should feel inclined to hold, independent of any statutes upon the subject, on account of the inapplicability of the Common Law rule to the condition and circumstances of our people, that it does not and never has prevailed in Illinois. But it is unnecessary to assume that ground in this case. The Legislature upon this subject from the time when we were a part of the Indiana Territory down to the last law contained in the Revised Statutes, clearly shows that the Legislature never supposed that this rule of Common Law prevailed in Illinois, or intended that it should. The first and second sections of the Acts of 1807 and 1819, which are incorporated into the Revised Laws of 1833, expressly required *all fields kept for inclosures to be well inclosed with a fence,* and subjected the owner of cattle breaking through such fence as the law required to the payment of damages. Now although those two sections were repealed by the Act of 1835, yet the same provisions were substantially re-enacted, except that what should constitute a sufficient fence was left to be determined upon the trial instead of being prescribed by law. Why these provisions, if the owner of cattle coming upon the lands of another was liable in any event, whether the latter had a fence or not? What did the law mean, by requiring all fields kept for inclosures to be well fenced? It has been argued that these provisions, and section 15 of chapter 51, Revised Statutes were declaratory of the Common Law. But the Common Law required no fences, how then could an Act making a fence requisite be declaratory of it? Would the Legislature be guilty of doing so absurd a thing, as to solemnly declare that the owner of cattle breaking into an inclosure, *the fence being good and sufficient* should be liable to damages, provide for summoning viewers to examine the fence, and leave its condition to be proved upon trial, when he would be liable at all events even though there was no fence? There are numerous other legislative Acts clearly manifesting the understanding of the Legislature, that cattle were permitted to run at large, and that the owners of fields were bound to fence against them. The eighteenth chapter of the Revised Statutes prohibits, under a penalty, the planting of castor beans

without securing "the same with as good and sufficient a fence as is generally put up and used for the protection of grain crops in the neighborhood." The 35th chapter subjects drovers to a penalty who drive off any cattle, hogs, &c. of any citizen, either from his own premises, or "from the range in which the stock of any such citizen usually run." The sixth section of the thirty ninth chapter prevents the taking up and posting "any herd of neat cattle, sheep, hog or goat, between the month of April and the first day of November, unless the same may be found in the lawful fence or inclosure of the taker up, having broken in the same.

The third section of the forty ninth chapter requires the person having possession of the horse of another under certain circumstances, "to turn the same out." Would the law direct an animal to be turned out where it had no right to run? Why all these various provisions and many others like them, if animals have no right to run at large?

It is manifest that the Legislature has all along acted upon the presumption that horses, cattle, hogs, &c., might lawfully be at large; the people have always so understood the law, and if there ever was a case where contemporaneous construction and acquiescence could be properly resorted to for the purpose of ascertaining the law, this is surely that case, both as regards the right of stock to run at large, and the necessity for fencing against them. ✱ ✱ ✱

But we are told that precisely similar statutes have been enacted in other States, upon which their Courts have put a construction which is obligatory upon this Court. An examination, however, of the legislation in other States referred to, does not warrant the conclusion assumed by counsel. Some of the statutes and cases construing them most relied upon, of which Massachusetts furnishes the strongest case, will be referred to.

By the third section of the Statute of Massachusetts of 1788, ch. 65, it was enacted: "That any person injured in his tillage, mowing or other lands under improvement, that are inclosed with a legal and sufficient fence, whether such improved land be in common or general field, or in a close by itself, by swine, sheep, horses or neat cattle, may have

Seeley *v.* Peters.

and maintain an action of trespass," &c. In the case of *Rust* v. *Low*, 6 Mass. 90, the Court held that the provisions of this section were merely in affirmance of the Common Law, and in assigning the reasons for so holding, the Court say: "By this section a man injured in his close which is sufficiently fenced, by sheep, swine, horses or neat cattle, may have his action against the owner. * * * But it cannot be supposed that when goats, asses or mules trespass upon his land, which is sufficiently fenced, that all remedy is taken away;" and as a further reason for their decision the Court refer to a subsequent section of the same Act, which gave the party his remedy in certain cases where his fence was insufficient. These reasons cannot apply in construing the fifteenth section of our Act, because there is no such omission as occurs in the Massachusetts statute, nor is there any subsequent section of the character therein referred to.

. The case of *Rust* v. *Low* is the foundation of that of *Little* v. *Lathrop*, 5 Greenl. 356, and several other cases to which reference has been made; but as the first case is based upon a statute different from ours, and cannot, therefore, be regarded as an authority in the construction of our Act, the cases founded upon it can have no greater weight. It is, however, insisted on the part of the defendant in error, that the fifteenth and three subsequent sections of the statute have reference only to partition fences, and in support of this proposition, reference is made to 3 Harrison, 368, 4 New Hamp. 36, 5 Greenl. 356, and some other authorities, to show that where a section of the statutes of those respective States had declared generally what should constitute a lawful fence, the Courts of those States construing the whole Act together, had limited the language so as to make it apply to partition fences only.

It would swell this Opinion to an unreasonable length, were the various enactments of all these States to be compared with ours, and the distinctions between them pointed out. But whatever may be the construction of their statutes

VOL. V. **10**

in the States where they were enacted, there can be little doubt, when we look into the legislation of our own State, that the fifteenth section was intended to apply to all inclosures. The first section of the Act of 1819 most clearly applied to all fences. Its language is general, and we have seen no similar provision in any other State. The Act of 1835, now constituting four sections of chapter fifty one of the Rev. Statutes, had no connection when originally passed, with any other Acts, either in reference to division fences, or inclosures of common fields; and the fact that in the revision of the laws it has been incorporated into the same chapter with other Acts in reference to fences, cannot, nor was it ever intended that it should alter its meaning. If the fifteenth section stood in an Act by itself, would any one think of restricting its language, which is general and applies as much to one sort of fences as another, to division fences? We cannot see the propriety of restricting the general language of the fifteenth section to one class of fences more than another. By this section a remedy is given to a party whose inclosure is broken into, "*the fence being good and sufficient*," and it necessarily follows, that unless the fence be good and sufficient no action lies, no matter whether that fence be a division fence, a fence against the highway, or against the unentered land of Government. The Legislature has not restricted the provisions of this section to partition fences, and we do not feel at liberty or inclined to do so.

The cases which have been referred to, to show that in several of the States cattle cannot lawfully be upon the highways, and that the owner of land is not bound to fence against cattle not lawfully upon the adjoining close, have no application here, for two reasons: *first*, because as has been shown, in this State a man to be entitled to maintain an action for the trespass of cattle upon his close, must have it surrounded by a good and sufficient fence ; and *secondly*, we have no general law in this State prohibiting cattle from running upon the highways, but, on the contrary, as has been shown, cattle in this State are permitted to go at large.

In the case of *Studwell* v. *Rich*, 14 Conn. 292, the Court, after stating the English law which requires every man to keep his cattle upon his own lands, say : "such is not the law of Connecticut," and they quote from Swift, who says : "The owners of land are obliged to inclose them with a lawful fence, or they can maintain no action for a trespass done thereon by cattle." "This law (the Court continues) naturally grows out of the situation of the country at the time of the first settlement of the State. It was more convenient for our ancestors to inclose their cultivated fields than their pastures. The cattle were suffered to roam over the uninclosed land, and obtain a subsistence wherever they could."

It is true the Court in Connecticut base their decision upon the statutes of that State, but it is equally true, that there was no statute directly repealing the Common Law rule upon this subject. In South Carolina, by the Common Law of that State, a similar doctrine prevails to that in Connecticut. *Fripp* v. *Hasell*, 1 Strob. 173.

An objection has been made to the constitutionality of a law by which one man's cattle are permitted to enter upon and consume the grass growing upon the land of another without compensation. We can see no force in this objection. The Legislature certainly has the right to regulate the means for enjoying property. It can hardly be insisted that if a man will not make use of the ordinary means to preserve his property, that the public is bound to preserve it for him, or else pay the losses which his own carelessness may have occasioned.

Since the decision in the 5th of Greenleaf, the law has been changed in Maine so that the owners of land are bound to fence against cattle, and in the case of *Gooch* v. *Stephenson*, 13 Maine, (1 Shepley,) R. 371, this very point of the constitutionality of the law was raised and thus disposed of by the Court : "If cattle lawfully on adjoining lands, stray where they might not go, they may be driven off. Or the owner of land may exclude the cattle of others by sufficient

fences, and if these are violated, he may seize and impound cattle doing damage, or maintain trespass against their owner. * * * Lands in this country cannot be profitably cultivated, if at all, without good and sufficient fences. To encourage their erection, it is undoubtedly competent for the Legislature to give to the owners of land thus secured, additional remedies and immunities. We perceive nothing in the law which violates or impairs the Constitution." Being, therefore, of opinion, that the rule of the Common Law requiring the owner of cattle, hogs, &c., to keep them upon his own ground does not prevail in Illinois, and that the tenant of land in this State is bound to fence against cattle, it follows that the instruction of the Circuit Court was erroneous, and its judgment is therefore reversed, and the cause remanded for further proceedings.

The following dissenting Opinion was delivered by

CATON, J. Differing, as I do, from the opinion of the majority of the Court, propriety and justice to myself, as one of its members, require that I should assign the reasons which have forced me to the opinion which I entertain. If the influence of this decision might not be felt beyond the case, or even this question, I might let it pass in silence; but the rules of construction which are adopted, not only in construing our statute by which the Common Law of England is adopted here, but the statutes relating to this particular subject, are such that I can give them no sanction by my silence, for I think if they become the settled doctrine of the Court, they will lead to alarming consequences. It is admitted, on all hands, that by the Common Law of England, every man was bound to keep his beasts within his own close, under the penalty of answering in damages for all injury arising for their being abroad, and that the owner of land was not bound to protect his premises from the intrusion of a stranger or his animals. By the first section of the sixty first chapter of the Revised Statutes, it is provided that, "the Common Law of England, so far as the same is applicable, and of a general nature, and

all statutes and acts of the British Parliament made in aid of, and to supply the defects of the Common Law, prior to the fourth year of James the First," (excepting three specified statutes,) " and which are of a general nature and not local to that Kingdom, shall be the rule of decision, and shall be considered as of full force, until repealed by legislative authority. " Let us first inquire whether this admitted principle of the Common Law was adopted by this statute, for this is questioned by those who disagree with me. That it is " of a general nature, " is too clear to require argument, and its exclusion, if sustained at all, must be upon the ground that it is not applicable. What did the legislature mean by the use of the word " applicable " ? Applicable to the nature of our political institutions, and to the genius of our republican forms of government, and to our Constitution, or to our domestic habits, our wants, and our necessities ? I think I must ever be of opinion, that nothing but the former was meant, and that to adopt the latter is a clear usurpation of legislative power by the Courts. If we adopt the former, but little difficulty will ever be experienced in applying the rule, and the question propounded will always be of a legal character, for legal rules will always determine whether any given portion of the Common Law is consistent with, or hostile to, the genius of a republic or the principles of our Constitution. By this principle, the rule by which any portion of the Common Law is excluded, or adopted, will apply with equal force all over the State. If we adopt the latter, then we are driven to examine, not a question of law and principle, but of convenience and policy. By this latter rule, we might have to hold a principle of the Common Law in force in some portions of the State and not in others; for in some places in it might be well adopted to the genius, and customs, the wants and expectations of the people, while it would be the very reverse in others. We should have to investigate, and decide upon facts, without any legal mode of of trying them, and not law. If we say that we will not enforce a principle of the Common Law, because, in our judgment, a different rule would be better for the general

good, or more just in principle, or more conformable to the habits and ways of the people, then it seems to me that we are legislating, and I know not where we should stop in this course of judicial legislation. If the Courts may say that this rule, or that, of the Common Law, is not law, be= cause a different rule would be more just, or would suit the people better, then they must assume that their judgments are infallible, and there is no longer any occasion for a Legislature to alter the Common Law, for the Courts will happily make all needful alterations. The very statement of such a proposition, in plain terms, is too startling to find an advocate, and too dangerous to admit of defence, and yet, it seems to me, that we are rapidly verging to that alarming position, if we are not already there.

For the purpose of proving that this principle of the Common Law is but illy adapted to a country like ours, and hence not applicable, several assumptions are made, some of which are mere matters of opinion, about which men may well differ, while others originate in a misapprehension of facts. Whether it would be better for each one to take care of his own stock, and allow these " extended prairies " capable of producing grain, sufficient to feed a nation, to be reduced to a state of cultivation, without the owner's expense and great delay of fencing them, where timber is scarce, would be but matter of opinion, which the people's representatives are much more capable of forming than we are. I think it quite as probable that the settlers located on the borders of the prairies, that they might cultivate farms, without the expense and delay of clearing off a heavy growth of timber, as that their moving object was to obtain a range for their cattle. Notwithstanding the privilege which it is said they have always enjoyed, not one part in a thousand of this luxuriant growth of grass, but has rotted and decayed where it grew, or more generally been consumed by fire. So it will ever be, for the want of those thousands of cattle to crop it, until brought into cultivation by the husbandman's plow. One acre in tillage is of more value than many acres of wild grass, which would seem to show, that as a

question of political economy, it were better to allow the land to be cultivated without the expense of inclosing it, to keep off strangers' animals, than to impose so onerous a tax upon the tillage of the soil, for the sake of the small value of grass consumed by cattle. Again, it is said by intelligent men, to be capable of demonstration, that one fourth the expense required to inclose the cultivated lands, and meadows in the State, would suffice to make pastures for all our stock. If so, it would show that this principle of the Common Law is not so inapplicable to the condition of our country and people. At least, so long as the Court might be mistaken in its notions of convenience, it demonstrates the propriety of leaving that question to the Legislature, where it properly belongs.

This principle of the Common Law is most unquestionably the law of natural justice, whence it originated, for it secures to each one the quiet enjoyment of his own, without intrusion or molestation from another. There is another principle of the Common Law which, in fact, expresses this in more general terms, and it is this : *You shall so use your own as not to injure another.* Is this maxim to be repudiated because it is not applicable to the genius of our people, and their customs and habits ? The decision of this case would seem to say so. It is not for the benefit of the tiller of the soil that the fence is made, for his crops will grow as well without it; but it is for the benefit of the owner of the animals, that he may be relieved from restraining their natural propensities. I have no more natural right to compel my neighbor to protect his crops against my swine, than I have his orchard against my children or myself. It cannot be successfully denied that this alteration of the Common Law, is imposing a burthen upon one for the benefit of another, which should never be done, at least without his consent, by himself or his representative. Again, it is assumed, that it has ever been the custom in this State, for the settlers to allow their stock to run at large. If this were so, it would not change the Common Law, for that can only be done by *legislative authority*. But the proposition

is by no means universally true, in point of fact. It is within my personal knowledge, that in many portions of the State, and I think it is almost universally so in the prairie settlements, it has never been the custom to allow swine and sheep to go at large, or to fence against them, and now, under this decision, all their crops may be destroyed with impunity. Again, it is said that "no man has ever questioned this right to let stock run at large;" and that "never till now, has the Common Law rule been supposed to prevail, or to be applicable to our condition." Here, again, the assumption is not supported by the facts. I have been for about sixteen years constantly engaged in the Courts in this State, and this is the first decision that I have ever known on this subject, where the Common Law rule has not been held to apply, although the question has often arisen, and been as often decided, and so universal has been the acquiescence of the Bar and the people, that this is the first case where the question has been brought up for review. I might, at least with equal propriety, say of such acquiescence, that it "is entitled to no little consideration in determining what the law is." It more properly, however, serves to show how unsafe it is for us to depart from the well settled rules of the Common Law, upon our own notions of its propriety, or convenience, or applicability, or upon what we believe to be the understanding of the community. Our powers and duties are not representative, nor is a position to be held to be law, because the people have generally understood or wished it to be so, but the Court must still look to other lights to find out what the law really is. When the principle becomes established, that the Courts shall construe the law as the people understand it, then will a Cleon be justified in taking an appeal from the decision of the Judge upon the bench, to the multitude in the Court House yard. Then may the lives and property of the citizens be subject to the fitful passions of our enfrenzied populace. It will ever be the glory of the Judiciary to stand boldly up, and with a manly energy and firmness, fearlessly proclaim the law as it is, in defiance of popular prejudice or public

clamor. I entertain no fears that any portion of the Judiciary will ever waver in its duty, in obedience to a sudden outburst of popular excitement; but the danger, if any, is that the influence of a general public opinion, long entertained, may induce the Courts to distort the law so as to conform to such opinion, rather than incur the public criticism, which might be induced by a decision which would disappoint public expectation. The latter, I think, is fraught with more permanent danger than the former, for the first would be soon corrected by the re-action of a temporary excitement, when those who had intimidated the Judge, would condemn him for having yielded to their influence; but no such consequence would be likely to follow the latter case, while the wound which principle would receive, might never be healed. While following the seductive lure of a general public opinion, the Courts would become familiarized with a departure from the stern and inflexible rules of the law, and as each decision becomes a precedent, authority would soon be formed for overturning the law, for the sake of public convenience, or to gratify public prejudice; and who can tell where such a course, at first, perhaps, convenient, and but for the precedent, advantageous— would end? Who does not see, if we start out with the principle of making our decisions conform to public opinion, and for a justification, say that the genius of our people, and their customs and habits demand it, we shall soon end in making our notions of their wants and interests, rather than the Common Law, or the express statute, the rule of determination, and as at no time will the public opinion alone be the alleged ground of decision, that too may be soon disregarded, and we shall be left to our own arbitrary notions of what is best adapted to the public good. That would be an usurped, and a despotic power.

But ours is not the only State where the Common Law seems to be undergoing radical changes in some of its fundamental principles, not by legislative authority, but by the will of the Courts. Nay, we find ourselves quite outstripped in this work of improvement, by some of our more en-

terprising or more venturesome neighbors. But lately we were informed that it had been discovered in one State, that a testator could not impose as a condition to a devise to his widow, that it should be void upon her second marriage, and that the Common Law on that subject is all wrong, and should be altered, and so the Court alters it and holds the condition void. Again, we learn that, in another case, has been made a great improvement upon the Common Law by holding that an attorney in a cause is an incompetent witness, although a few years ago hardly any enlightened Court would have allowed counsel to argue either proposition. That a condition to a grant or devise prohibiting marriage is void, as a general rule, may not be denied; but the cases are as uniform that by the Common Law (though not by the Civil Law,) a devise to the testator's widow is an exception to the general rule; (see 1 Story's Eq. Jur., § 285, and cases cited in note 4;) yet all the cases establishing this exception are quite overlooked by that Court in its glowing admiration of the general rule. If startling at first, these innovations upon the Common Law will soon cease to surprise us. Although both may be real improvements, (and I have no doubt but that the exclusion of an attorney in the cause as a witness would be,) I think it would be much safer and better that they should be made in a constitutional way by the Legislature.

I will allude to one or two cases for the purpose of seeing what progress we are making in this work of improvement. In the case of *Boyer* v. *Sweet*, 3 Scam. 120, the Court professedly decide against the principles of the Common Law, upon the ground that the new rule adopted will be more convenient and just under our business habits, and the alleged pliability of the Common Law is asserted for its overthrow. Now I complain more of the principle avowed than of the decision itself, for authorities may be found sustaining that decision upon Common Law principles. Is the Common Law only clay in the hands of the Courts, to be moulded and shaped by them to suit their wills? In the case of *Penny* v. *Little*, 3 Scam. 301, the doctrine avowed in the former case is practically carried out. The question there

involved the right of a landlord to distrain for rent where no such right was reserved in the lease. It is admitted that by the Common Law he had no such right, and that we have no statute conferring the right. In England there is a late statute giving the authority. And here without any such statute, and against the Common Law, it was held that the landlord possesses this despotic power over his tenant. If this is more conformable to the genius of a republic or our people, it remains to be shown. But the people had so understood the law, for they had submitted to its practice for twenty years. This Territory once belonged to Virginia, and although it is not shown that her laws authorized such distress, the Court says: "The legislation of the Territory and of our State was adopted in reference to the law as it then existed in the country. Upon this principle and none other, can we account for the numerous cases in which the Common Law has been changed by statute in England since the fourth of James I., and those changes adopted by the Courts in this country without having been first re-enacted by our legislatures." How is it that the Courts in this country possess so much more power to change the law than in Great Britain? There, this very change could only be effected by an Act of Parliament; here, it is done by the Court alone, not only without legislative sanction, but in defiance of the positive mandate of our statute adopting the Common Law, and the principle clearly and deliberately proclaimed that they have the right to do so. This power is not given by the Constitution or laws, but is usurped by the Court, probably in deference to a public opinion of twenty years' standing. But this supposed public opinion has not the merit of having originated in a sense of justice, for the landlord has no more abstract right to distrain for his rent, than the merchant for his goods. By what rule of right or reason should the landlord and none others be allowed to seize and sell his debtor's goods without a judgment and without a trial? Is that in harmony with the equality or genius of a republic? But a mistaken notion of the law by the public cannot make the law, and yet, had this public

opinion for these twenty years been the other way, I am inclined to think the decision would have been the other way too. There is a place where public opinion may be legitimately exercised and properly represented, and to the Legislature alone should we look for changes in the law. If we are careful to keep within our own constitutional sphere, I think we shall do the best. Of all others, we should be the last to transcend our powers.

By the construction given to the word *applicable,* we assume the right to disregard any other provision of the Common Law, which in our judgment would be inconvenient, and no one can safely advise his client relying upon the Common Law. After this assumption no step remains to be taken to unite in our own hands the powers delegated by the Constitution to two separate departments of the government. Should the Legislature as manifestly assume judicial powers, I think we should not hesitate to declare the Act unconstitutional. And yet this principle which is so broadly claimed in the case of *Penny* v. *Little,* is now again asserted in unqualified terms, and those cases both referred to with approbation. This has led me to a somewhat extended examination of this doctrine, which, it seems to me, is fraught with so much danger, and to which I cannot consistently subscribe. And I hope the fact that this case is at last decided professedly on other grounds, will prevent it from being used as authority for the extension of this principle. With how much more propriety might the Court have held that the Common Law, as applied to navigable rivers in England, was not applicable here. If physical causes could justify us in holding any portion of the Common Law inapplicable, we might with truth have said, that a rule founded upon and applied to the diminutive streams of Great Britain, where its theory is generally supported by a coincidence of facts, was not applicable to the great rivers of this continent, which are, in fact, navigable for thousands of miles above tide-water, and yet this Court, with a manly firmness which has challenged the admiration of some of the ablest jurists of other States, asserted and administered the Common Law

Seeley v. Peters.

as it found it, without attempting to fritter it away because it was not applicable. See *Middleton* v. *Pritchard*, 3 Scam. 510, and note of Chancellor Kent on that case, 3 Kent's Com. (6 ed.) 432.

But this is not the first time that the inapplicability of this portion of the Common Law has been urged. In most of the cases to which reference will hereafter be made was the same argument used, and particularly in the cases in 5 Greenl. 356, and 6 Mass. 90, was it contended by eminent counsel, that this principle of the Common Law should not be enforced because it is not adapted to a new country. But the argument was repudiated by the Courts, and a very strict and limited construction given to their statutes in order to uphold the Common Law, which could only be repealed by the clearly expressed will of the Legislature in a positive enactment for that purpose. Those Courts were content to administer the law as they found it, leaving it to the Legislature to make the change, if desired by the people. How different here!

Having assigned the reasons for my opinion, that this portion of the Common Law was adopted with the rest by our statute, and that it cannot be disregarded by the Court till changed by legislative authority, I shall proceed to examine whether it has been so changed.

All the statutes which we now have, or have had since January, 1835, are embraced in the fifty-first chapter, Revised Statutes. But as several of the provisions of that chapter were originally passed in several different acts, and as I concur in the opinion that we are to construe them precisely as if they were now only to be found in the original Acts as they were passed, it becomes necessary first to examine their history. In 1819, an Act was passed, the first section of which provided "That all fields and grounds kept for inclosures shall be well inclosed with a fence composed of," &c. and then prescribed very minutely the character of the fence. The second section was the same as the fifteenth section, fifty-first chapter, Revised Statutes, except that the words "the fence being of the aforesaid height and strength'

were used instead of "the fence being good and sufficient," as it is now. The third and last section of that Act prescribes the rule on the subject of division fences and was the same as sections eleven, twelve, thirteen and fourteen of chapter fifty-one, Revised Statutes. Thus the law continued till the Act of 1835 was passed. By that Act,—which by its title professed to be an amendment of the former law, —the first and second sections of the Act of 1819 were repealed, the second section re-enacted with the alteration above specified, and three new sections were added, which now compose sections sixteen, seventeen, and eighteen of chapter fifty-one, Revised Statutes. We learn from this, that by the rule of construction before laid down, and in which we all agree, that sections eleven to eighteen inclusive must all be construed together; for sections eleven to. fifteen inclusive were originally passed togetl er, and ccmposed the whole of the Act of 1819, except the first section, which was repealed by the Act of 1835 and, as I shall presently show, has never been re-enacted. It will not be denied that an amendatory Act, must be construed in connection with what is left unrepealed of the original Act. By these rules section fifteen, chapter fifty one, Revised Statutes, has a double claim to be construed in connection with the four sections which now precede it ; *first*, as having originally composed a part of the same Act with them, and *second*, as being re-enacted by and composing a part of the Act of 1835, which was an amendment to that Act. And the three sections which now follow it should be construed with it, and the four preceding sections, because they were originally enacted in a law which was an amendment to an Act of which they formed the whole, except the first section which was repealed.

Having thus settled the rules by, or rather the connection in which these statutes should be construed, I will proceed to examine these sections from eleven to eighteen inclusive, for the first ten sections relate to common fields alone, and the last two to fences made by mistake, and it is not pretended that they have any thing to do with the question. I

will first show that no part of the first section of the Act of 1819, which was repealed by the Act of 1835, has ever been re-enacted, for it is the peculiar phraseology and strong expressions used in the first two lines of that section, upon which reliance is placed and the argument is based, showing that this provision of the Common law is repealed. Indeed, it is expressly stated that sections one and two of the Act of 1819 "were substantially re-enacted, except, that what should constitute a sufficient fence was left to be determined upon the trial, instead of being prescribed by law," and it is inquired, "why these provisions, if the owner of cattle, coming upon the lands of another, was liable in any event, whether the latter had a fence or not? What did the law mean by requiring all fields kept for inclosures to be well fenced?" There might have been force in these interrogatories, were that first section now in force, but unfortunately for the argument which they contain, it is an entire misapprehension that any part of that section has ever been re-enacted. Nothing of these peculiar expressions, nor any one sentence or part of sentence of that first section, nor any idea, or principle or provision which it contained is to be found in the law of 1835, nor in any law since, nor in any other law upon our statute books. This, I think, is capable of demonstration. It is not in sections eleven to fourteen inclusive, for they relate entirely to division fences, and are a copy of the third section of the Act of 1819, of which the section in question was the first. It is not in the fifteenth section, for that is devoted entirely to the re-enactment of the second section of the same Act of 1819, and is almost a literal transcript of it, except. the words "a good and sufficient fence" are used instead of "the fence being of the aforesaid height and strength;" and this change became necessary in consequence of the repeal of the first section, which contained a minute description of the fence, to which the word "aforesaid" referred. But as this is the section probably relied upon, I will quote it at length. "If any horse, mare, gelding, colt, mule or ass, sheep, lamb, goat, kid, bull, cow, heifer, steer or calf, or any hog, shoat or pig,

shall break into any person's inclosure, the fence being good and sufficient, the owner of such animals shall be liable in an action of trespass, to make good all damages to the owner or occupier of such inclosure, for the first offence single damages only, and ever afterwards double the damages sustained." Where do we find in this, any thing like a re-enactment of any portion of that first section? I cannot read here those potent words, "that all fields and grounds kept for inclosures shall be well inclosed with a fence"— and yet there is nothing else in that first section except a description of the fence. It ought not to be contended, that the Legislature intended to re-enact both sections repealed, when they have only copied the words of one, when there is not the least similarity between the two, each one performing an entirely different office; and yet this is the section manifestly relied upon; at least there is none other that comes so near it, if it is possible for the others to be more foreign than this. Whether this section of itself changes the the Common Law rule, I will examine presently.. I am now endeavoring to show that the first section, upon the peculiar words of which so much reliance is placed, has not been re-enacted.

The next section, which is the sixteenth, authorizes the injured party to complain to a justice of the peace, who shall summon three householders to view the fence, and their testimony shall be good evidence touching the sufficiency of the fence. The seventeenth section provides, that if any person injured for want of a sufficient fence shall hurt any of the aforesaid animals, he shall pay the damages. And section eighteen provides, that the owners of animals trespassing shall be notified, and if they refuse to secure them, the injured party may do so, and recover compensation for their feed. This composed all there was of the Act of '35, and all there is upon our statute book which can, by possibility, touch this question. It seems to me it would be extravagant in any one to contend, that there is anything in either of these three sections, which either directly or constructively re-enacts any portion of that first section. In-

dead, they do not admit of argument either way, for the statement of their contents demonstrates the negative.

If I have succeeded in showing that the first section of the Act of '19 has never been re-enacted, then all the argument fails which rests upon that section, and that there has been a misapprehension on that subject, it seems to me there can be no doubt. This, I believe, will be made still more apparent by what will be said, in giving my construction of those sections, which I shall now proceed to do.

Section fifteen, chapter fifty one, of the Revised Statutes, which was the first section of the Act of '35, where it was re-enacted from the Act of '19, has been already quoted at length, and proves that if any horse, &c., shall break into any inclosure, the fence being good and sufficient, the owner shall be liable to an action of trespass "for the first offence, single damages only, and ever afterwards, double the damages sustained." Independent of any decisions which have been made in other States upon statutes on this subject, I do not think, by any known rule of construction, this can be held to have taken away the Common Law remedy. It contains no intimation of an interest to repeal the Common Law, nor is it in any way inconsistent with it. It is clearly cumulative to the Common Law, and not hostile. It gives an additional remedy, in the nature of a penalty, greater than was known at the Common Law, which may well exist without diminishing the Common Law right. The statute books are full of such cases, and it would be a useless waste of time to quote authorities to show that such statutes are never construed to take away Common Law remedies, in cases which do not come within the provisions of the statute, and entitle the party to a remedy under it. Manifestly, the whole object of this statute was to give the party a right to double damages for the second and subsequent trespasses, when he entitles himself to them by keeping up a good and sufficient fence. Instead of relieving the owner of the animals from any liabilities imposed by the Common Law, it manifestly increases them. It is not for his benefit, but for the advantage of the owner of the close who will keep up a fence. The ob-

Seeley *v.* Peters.

ject is to encourage fencing by extraordinary rewards, and not to compel it by an abridgment of rights. It seems to me absurd to say, if a man will not entitle himself to the extraordinary remedies, tendered him by the statute, that therefore he shall be deprived of even the rights guarantied to him by the Common Law. It is asked, " Would the Legislature be guilty of so absurd a thing as to solemnly declare, that the owner of cattle breaking into the inclosure, the fence being good and sufficient, should be liable to damages, provide for the summons of viewers to examine the fence, and leave its condition to be proved on the trial, when he would be liable, at all events, although there were no fence?" It is unfortunate for the argument contained in this interrogatory that the concluding words of the section, " and ever afterwards, double the damages sustained," were overlooked. When we observe these, we see that the Legislature has not been guilty of so absurd a thing, as merely to reiterate a Common Law right; although such things are frequently done by very intelligent legislatures, as was the case in Massachusetts, where the enactment is substantially the same as this section omitting these concluding words, which was held to be merely declaratory of the Common Law, and not to repeal it. *Rust* v. *Low*, 6 Mass. 90. Our statute evidently meant something more, which was to give the party an additional and more salutary remedy who should entitle himself to it, by the performance of two conditions. One, the keeping up the fence, and the other the recovery of single damages, would serve as an admonition to the other party that his cattle were breachy. And this explains the reason why Common Law damages are prescribed for the first offence. The whole law is clear and intelligible, and well calculated to effect the manifest intent of the legislature, which, as before stated, was to give a new remedy under certain circumstances, without taking away the old. The sixteenth section simply prescribes the mode of proceeding under the fifteenth, and the seventeenth declares that persons injured for want of sufficient fence, shall be liable for damages done by them to animals, and the eighteenth

section authorises persons trespassed upon to secure the animals, where the owners refuse to do so. But it is not, nor can it be pretended that either of these sections repeal or take away the Common Law remedy.

I have not thought it necessary to examine whether the construction given to the first section of the Act of '19 be correct or not, but have contented. myself with showing, which I think I have done conclusively, that it has been repealed, and has never been re-enacted. If this be so, and the construction given to that section be correct, it proves beyond controversy, that the Common Law rule is now in force, for it is a rule of construction which has been adopted by this Court, (and to which, I venture to say, no exception can be found,) that where an Act is passed in derogation of, or changing the Common Law, the repeal of such Act affords the most conclusive proof that the Legislature intended to return to the rule of the Common Law. *Bedell* v. *Janney,* 4 Gilm. 207 ; *Ellis* v. *Page,* 1 Pick. 45.

As the Common Law remedy is now held to be taken away, hereafter the remedy must be sought under this statute, and, necessarily, the course prescribed by the sixteenth section must be pursued. And as a good and sufficient fence is necessary to entitle the party to recover, that, of course, ought to be averred in the declaration. , Such would, undoubtedly, be the rule, should the party seek to recover double damages under the statute, and yet no more so than when he claims single damages under the same Act. If such has been the usual practice, I am not advised of it. But I think I can see other difficulties, more embarrassing still than these, but I will not advert to them now. But it is said that our legislation on this subject clearly shows that the Legislature never supposed that this rule of the Common Law prevailed in Illinois, or intended that it should. If the Legislature always supposed that the law was as they intended it should be, this proves conclusively that they never intended to change it, for I have yet to learn that the bare supposition of the Legislature, or their ignorance of the law, can make or change a law, a law so important as this, affecting

the whole agricultural interest of the State, should only be changed by the positive action of the Legislature, clearly manifesting such intention, and not by a doubtful supposition.

Some other portions of our statutes are referred to, not for the purpose of showing that this provision of the Common Law was thereby repealed, but in order to prove that the Legislature supposed that cattle might run at large, and that people were bound to fence against them. The first requires castor beans to be fenced, and another forbids drovers from driving off cattle from the owner's premises, or from the range. To these might have been added the law of 1824, requiring saltworks to be barricaded, and the law of 1835, requiring saltpetre caves to be fenced. Admitting the inference to be correct, I have before attempted to show that it neither proves what the law is, nor alters it. But from these special Acts I draw a directly opposite conclusion. I think they prove conclusively that the Legislature did not suppose that it was the duty of the owner of a close to fence it. If the law already required these fences to be erected, I I may well ask, "would the Legislature be guilty of so absurd a thing as to solemnly pass these special Acts, when they knew that the same thing was required by the law before?" If without these laws, cattle had a right to run at large, and it was the duty of the owner of the premises to fence against them, and for the want of such fence, the cattle went upon the close and were damaged by the beans, the salt water, or the saltpetre, thus carelessly exposed, the owner of the premises would have been responsible for the damages. Coke's Litt. 56, A. ; Roll's Abr. 88; *Blyth* v. *Topton*, Cro. Jac. 158; *Townsend* v. *Wathen*, 9 East, 277 ; *Bush* v. *Brainerd*, 1 Cowen, 78. Nor are we to infer that the Legislature supposed cattle might lawfully run at at large, wherever they could go, because it saw fit to guard against extreme danger to such as were at large. It is well known that cattle may often break away without the fault of the owner.

But the decisions in other States upon statutes on this subject, I will not say upon statutes like ours, for they are

all much stronger, are more conclusive in favor of the Common Law, than anything which I have or could say, and it seems to me should have controlled this case. I had intended to have examined these statutes and decisions minutely, but I have already said so much on this subject that I must content myself with little more than a reference to them.

In Massachusetts, the statute defines what "shall be deemed a legal and sufficient fence," and then provides "that any person injured in his tillage, mowing or other lands under improvement, that are inclosed with a legal and sufficient fence, whether such improved lands be common or general field, or in a close by itself, by swine, sheep, horses, or neat cattle, may have his action of trespass," &c. This statute was held to be merely an affirmance of the Common Law, and not as repealing it, and that trespass might still be maintained without a fence. 6 Mass. 90. This statute, it will be observed, is almost identical with our 15th section, except that it does not give double damages, which makes ours much stronger, as it does not leave the Legislature in the supposed dilemma of having passed a useless Act, merely affirming the Common Law. The same decision was made in Maine upon a similar statute. 5 Greenl, 356. And so also in Vermont.

The New Hampshire statute provided, "that when any damage shall be done to any person whose fences are insufficient, and such damage shall happen through the deficiency of the fences by swine yoked and ringed according to law, horses fettered, and other creatures not prohibited from feeding upon the highways or commons, the person sustaining damages may not impound the creatures so doing damage, nor shall he recover damages therefor." It was held even under this statute, that no person was bound to fence against the highways, and it was applied alone to division fences, and yet, what is there in our statute containing so much evidence of an intent to repeal the Common Law as this? Had there been, I might have acquiesced in silence.

The statute of New Jersey is scarcely less explicit. After defining what shall be esteemed a lawful fence, it proceeds:

"And if cattle break through, they may be impounded, and if any owner of land shall neglect or refuse to make his lawful fence, he shall not recover, and the owner of the cattle may give this in evidence under the general issue." Rev. Laws, N. J. 335, §§ 1, 9.. As in New Hampshire, this statute (it is manifestly the statute construed, although I have been unable to obtain the book referred to,) was held not to repeal the Common Law remedy, for trespass by cattle coming in from the highways or from strangers' land, but was confined to division fences. 3 Harrison's (N. J.) R. 368. The opinion in this case is worthy a careful perusal.

But it is said that "the Act of '35, now constituting four sections of chapter 51, Rev. Stat., had no connection, when originally passed, with any other Act, either in reference to division fences or inclosures of common fields." This is an entire mistake, unless an amendatory Act has no connection with the Act amended, for the Act of '35 professed by its title to be an amendment to the Act of '19, the third and only unrepealed section of which, is entirely devoted to division fences, and contained all the law which we now have or ever had on that subject. Besides, the first section of the Act of '35, which is the one relied upon, was a re-enactment of the second section of the Act of '19; so that not only is it found in an amendment to that Act, but it originally formed a part of it, which I think makes out a pretty intimate connection with an Act in reference to division fences. This is truly an unfortunate misapprehension, for by it is lost the aid and authority of the decisions just referred to, in which their statutes were construed to apply alone to division fences, because they were originally passed in Acts regulating such fences. We now see that such is the precise case with our law, and no cases could possibly be more in point, nor can their force be explained away or avoided, unless it is upon the ground that a cumulative remedy is given, according to my former construction.

The right to allow cattle to run in the highways, and the duty to fence against them, supposed to be created by several statutes in Massachusetts, are examined with remark-

able ability in the case of *Stackpole* v. *Healey*, 16 Mass.
33.    Some of their statutes speak of cattle &c. going at
large generally, and others of their going at large on the
commons, and another law regulates the manner in which
horses may go at large on the *commons and ways* of a town.
Other laws conferred upon towns the authority to grant lib-
erty for horses *to go at large* and unfettered.   The Court
held that none of these statutes made it lawful for animals
to go at large on the highways, but only on the common
lands of the town, and consequently it was not the duty of
the owners of land to fence against them.   I cannot refrain
quoting a few passages from the Opinion of the Court, which
was unanimous.   They say: "Did the Legislature mean to
touch rights protected by the Common Law?   I may ask
another question : Could they do so if they were disposed,
(which is a case not to be supposed,) without making com-
pensation to the owner?   Take the case of a fruit tree
standing in the road, but in a situation affording a conven-
ient shade to the traveller ; an ornament, but not a nuisance
to the way, but yielding an annual profit to the owner of the
soil.   Now the Legislature might, if they thought it expe-
dient, provide by law, that for the future the soil of all high-
ways should be vested in the public, and compensate the
owner accordingly."   To show that this decision is not sin-
gular, I will refer to the case of *Holliday* v. *Marsh*, 3 Wend.
147.   By the twelfth section Revised Laws, New York, 133,
the inhabitants of towns are authorized to make rules for
improving their common lands, and for making their parti-
tion and circular fences for their *lands, gardens, orchards,
&c.*, "and the times, places, and manner of permitting or
preventing cattle, horses, sheep, swine, or any of them, *to
go at large*," &c.   "And for ascertaining the sufficiency of
all partition *and other fences*," &c:   The seventeenth sec-
tion provides "in case a person who has made his proportion
of the division fence shall conclude or be disposed to throw
up his said lands or meadow to *common feeding*, or to let
the same lay open, such person shall give three months'
notice," &c.   The Court said that these provisions did not

authorize the towns to permit cattle, &c. to run at large in the highways, or upon the lands of individuals, thus thrown up to *common feeding*, but apply the Common Law rule to uninclosed lands. In the Opinion of the Court, Savage, C. J., says: "Suppose a case where the town has no common land, and they pass a by-law permitting cattle to run at large; where are they to run? Surely not on individual property. Where then? in the highway? The public have simply a right of passage over the highway; they have no right to depasture the highway. The owner of the land through which the highway runs, is the owner of the soil and of the timber, except what is necessary to make bridges, or otherwise aid in making the highway passable. (15 Johns. 453.) And if the owner of the soil owns the timber, why not the grass?"

Let me ask where can anything be found in our statutes, which will bear any comparison with those of Massachusetts and New York, as tending to prove either the intention or the understanding of the Legislature that cattle might run at large, either on the highway or on the uninclosed lands of individuals? Nothing has been referred to, except the law requiring castor beans to be inclosed, and the law prohibiting drovers from stealing cattle, which, as I have before attempted to show, prove the reverse. If those statutes in other States, with the strong expressions which they all contain, were held not to take away the Common Law right, how much more should our statute, which contains no such expressions, be construed in the same way. The question is constantly recurring to my own mind, by what rule of construction is it held that our statute has repealed and destroyed this universally admitted Common Law right, when no word or intimation to that effect can be found in it? The most and all that can be said of it is, that it has created a new right, cumulative to and perfectly consistent with the Common Law right; and when that is the case, the universal rule is that both shall stand together.

A case in the 14 Conn. R. 292, is referred to to show that the Common Law rule ought not to be enforced here. But

this portion at least of the Common Law appears never to have been adopted there; and besides, the question in that case arose about a division fence, and whether a certain creek was sufficient as such, and of course can have no application here.   I may remark, further, that that case was decided by a divided Court.   Nor is the case from South Carolina entitled to more consideration, for it was not pretended to be decided upon the English Common Law, which is not binding upon the Courts of that State. 1 Strobhart, 173; 3 Dessaussure, 427.   When we adopt the Common Law of South Carolina, that case may be considered as authority.

Although this case by itself may be insignificant, yet the principles involved are important, and I have felt that I could not say less than I have, in assigning the reasons which have led me to the conclusion at which I have arrived.   I am of opinion that the judgment should be affirmed.

*Judgment reversed.*