[L. A. No. 967. In Bank.—November 28, 1903.]

LEAH J. KATZ, Executrix, etc., et al., Appellants, v. MARGARET D. WALKINSHAW, Respondent.

WATER-RIGHTS — PERCOLATING WATER — ARTESIAN BELT.— RIPARIAN RIGHTS.—An underground body of water lying in an artesian belt, which does not flow in any defined stream, but is produced by percolation through saturated soil, and is pressed forward by water accumulating from ravines, cañons, and streams above, pressing down into the soil by percolation, is not a watercourse, and is not governed by the law of riparian rights.

ID.—RIGHTS OF OWNERS OF PERCOLATING WATER—REASONABLE USE—INTERFERENCE WITH PERCOLATION.—Each owner of soil lying in a belt which becomes saturated with percolating water is entitled to a reasonable use thereof on his own land, notwithstanding such reasonable use may interfere with water percolation in his neighbors' soil; but he has no right to injure his neighbors by an unreasonable diversion of the water percolating in the belt for the purpose of sale or carriage to distant lands.

ID.—MAXIM APPLICABLE.—The maxim, *Sic utere tuo ut alienum non lœdas,* is applicable as between adjoining users of percolating water, whenever justice requires its application.

ID.—DIVERSION FROM ARTESIAN BELT FOR SALE—INJUNCTION.—The owners of artesian wells sunk in an artesian belt of percolating water, the waters from which are necessary for domestic use and irrigation of their lands, on which are growing trees, vines, shrubbery, and other plants of great value, are entitled to an injunction to restrain the diversion of the water percolating in the artesian belt, by an owner of land situated in the belt, for the purpose of conveying the same to distant lands for sale, to the irreparable injury of the plaintiffs.

ID.—PLEADING—SUBTERRANEAN STREAM—INJURY TO ARTESIAN WELLS—SURPLUSAGE.—Where the complaint for the injunction stated in substance that plaintiffs had wells in their respective tracts, from which water flowed to the surface of the ground, which was necessary for domestic use and irrigation of their lands, and that the defendant by means of wells and excavations on her own lands

drew the waters from plaintiffs' lands and conveyed them to distant lands, it states a cause of action for an injunction to restrain the diversion of percolating water; and an averment that the diversion was from an underground stream may be regarded as surplusage.

ID.—EVIDENCE—IMPROPER NONSUIT.—Where the evidence supported the cause of action for wrongful diversion of percolating water from the lands of plaintiffs to their irreparable injury, a nonsuit should not have been granted, though the allegation of diversion from a subterranean stream was not proved.

ID.—APPLICABILITY OF COMMON LAW—VARYING CONDITIONS—CESSATION OF RULE.—Such parts of the common law of England as are not adapted to our condition, form no part of the law of this state. The common law, by its own principle, adapts itself to varying conditions, and modifies its rules so as to subserve the ends of justice under different circumstances, and recognizes the principle embodied in section 3510 of the Civil Code, that "when the reason of a rule ceases, so should the rule."

ID.—RULE AS TO PERCOLATING WATER INAPPLICABLE.—The common-law rule that percolating water belongs unqualifiedly to the owner of the soil, and that he has the absolute right to extract and sell it, is not applicable to the conditions existing in a large part of this state, where artificial irrigation is essential to agriculture, and artesian wells in percolating belts are necessarily used for that purpose.

ID.—DIFFICULTIES IN PREVENTING DIVERSION.—The difficulties that the courts will meet in securing persons necessarily using percolating water for irrigation by means of artesian wells from the infliction of great wrong and injustice by its diversion, if property right therein is recognized, cannot justify the court in abandoning the task as impossible. The courts can protect this particular species of property in water as effectually as water-rights of any other description.

ID.—RULES APPLICABLE—PRIORITY—CORRELATIVE RIGHTS—INJUNCTIONS.—The rules respecting priority of appropriation and correlative rights in regard to the appropriation and use of percolating water include the right to appropriate any surplus not needed for use by well-owners on their lands, and an equitable adjustment of disputes between overlying landowners, where the supply is insufficient for all, and proper rules relative to injunctions and the remedy at law should be applied to the solution of questions arising in the courts as to such waters.

APPEAL from a judgment of the Superior Court of San Bernardino County. John L. Campbell, Judge.

The main facts are stated in the opinion of the court on the original hearing in Bank. Further facts are stated in the opinion of the court on rehearing.

C. C. Haskell, Rolfe & Rolfe, and H. C. Rolfe, for Appellants.

One cannot divert surface, or underground, or percolating water to the injury of another, unless it is done to protect or benefit his own land. He cannot conduct it to a distance on other lands or divert it so as to injure his neighbor's land. (*Case* v. *Hoffman*, 84 Wis. 438;[1] Gould on Waters, 263; *Bassett* v. *Salisbury Mfg. Co.*, 43 N. H. 569;[2] *Sweet* v. *Cutter*, 50 N. H. 439;[3] *Bartlett* v. *O'Connor*, (Cal.) 36 Pac. Rep. 513; *Wheatley* v. *Baugh*, 25 Pa. St. 528[4] *Herriman Irr. Co.* v. *Butterfield Min. etc. Co.*, 19 Utah, 453; *Smith* v. *City of Brooklyn*, 18 App. Div. 340; 46 N. Y. Supp. 147; *Forbell* v. *City of New York*, 56 N. Y. Supp. 790; 164 N. Y. 522.[5])

G. H. Gould, *Amicus Curiæ*, also for Appellants.

Percolating waters cannot be taken away from a soil-owner who has a beneficial use of them to his injury without beneficial use on the land of the taker. (*City of Los Angeles* v. *Pomeroy*, 124 Cal. 621, 644; *Hanson* v. *McCue*, 42 Cal. 303.[6]) Many equities in percolating water must be recognized and protected, and the first step toward a clear view of the subject should be in the direction of abolishing an antiquated and misleading formula.

Byron Waters, for Respondent; R. E. Houghton, for Riverside Water Company; E. W. Freeman, for Temescal Water Company; John E. Daly, and Henry J. Stevens, for Glendora-Azusa Water Company; Lucius K. Chase, for Corona City Water Company; Henry J. Stevens, for Citrus Belt Water Company; C. H. Wilson, for Corona Irrigation Company; M. B. Kellogg, for Gage Canal Company; Page, McCutchen, Harding & Knight, for Contra Costa Water Company; Houghton & Houghton, for Miller & Lux and Frederick Cox; Frank H. Short, Otis & Gregg, Howard Surr, Platt & Bayne, and Henley C. Booth, City Attorney of Santa Barbara, *Amici Curiæ*, also for Respondent.

The plaintiff can only recover on the cause of action alleged, which is for diversion of a subterranean stream, and not for diversion of percolating water. A plaintiff cannot recover on

[1] 36 Am. St. Rep. 937.
[2] 82 Am. Dec. 179.
[3] 9 Am. Rep. 276, and note.
[4] 64 Am. Dec. 721, and note.
[5] 79 Am. St. Rep. 666.
[6] 10 Am. Rep. 299.

a different cause of action from that alleged. (*Mandran* v. *Goux*, 51 Cal. 151; *Reed* v. *Norton*, 99 Cal. 617, 619; *Eastlick* v. *Wright*, 121 Cal. 309; *Kelly* v. *Plover*, 103 Cal. 35; *Riverside Water Co.* v. *Gage*, 108 Cal. 240, 244; *Rudel* v. *Los Angeles County*, 118 Cal. 281, 286; *Wallace* v. *Farmers' Ditch Co.*, 130 Cal. 578, 583; *Schirmer* v. *Drexler*, 134 Cal. 134, 139.) The law of California is settled that percolating water belongs absolutely to the owner of the soil, with the right to use and divert it as the owner sees fit. (*Hanson* v. *McCue*, 42 Cal. 303;[1] *Painter* v. *Pasadena L. and W. Co.*, 91 Cal. 74, 82; *Southern Pacific Co.* v. *Dufour*, 95 Cal. 616; *Gould* v. *Eaton*, 111 Cal. 641;[2] *City of Los Angeles* v. *Pomeroy*, 124 Cal. 597; *Vineland Irr. Dist.* v. *Azusa Pl. Dist.*, 126 Cal. 486.) The California law on this subject accords with the great weight of American and English authorities. (27 Am. & Eng. Ency. of Law, 425; *Breuning* v. *Dorr*, 23 Colo. 195; *Wilson* v. *Ward*, 26 Colo. 39; *Roath* v. *Driscoll*, 20 Conn. 533;[3] *Brown* v. *Ilius*, 25 Conn. 593; S. C. 27 Conn. 84;[4] *Metcalf* v. *Nelson*, 8 S. Dak. 180 Ill. 99; *New Albany etc. R. R. Co.* v. *Peterson*, 14 Ind. 116; 89;[5] *Deadwood Cent. R. Co.* v. *Barker*, 14 S. Dak. 558; *Tampa Waterworks Co.* v. *Cline*, 37 Fla. 586;[6] *Saddler* v. *Lee*, 66 Ga. 45;[7] *Warmack* v. *Brownlee*, 84 Ga. 196; *Edward* v. *Haeger*, 180 Ill. 99; *New Albany etc. R. R. Co.* v. *Peterson*, 14 Ind. 116; *Taylor* v. *Fickas*, 64 Ind. 172;[8] *City of Emporia* v. *Soden*, 25 Kan. 588;[9] *Kinnigird* v. *Standard Oil Co.*, 89 Ky. 473;[10] *Chase* v. *Silverstone*, 62 Me. 175;[11] *Chesley* v. *King*, 74 Me. 164;[12] *Greenleaf* v. *Francis*, 18 Pick. 117; *Wilson* v. *New Bedford*, 108 Mass. 26; *Davis* v. *Spalding*, 157 Mass. 431; *Upjohn* v. *Richland Twp.*, 46 Mich. 549;[13] *Ocean Grove C. M. Assn.* v. *Asbury Park*, 40 N. J. Eq. 447; *Ellis* v. *Duncan*, 21 Barb. 230; *Dehli* v. *Youmans*, 50 Barb. 305; *Goodale* v. *Tuttle*, 29 N. Y. 459; *Trustees of Dehli* v. *Youmans*, 45 N. Y. 362;[14] *Bliss* v. *Greeley*, 45 N. Y. 671;[15] *Johnstown etc. Co.* v. *Veght*, 69

[1] 10 Am. Dec. 299.
[2] 52 Am. St. Rep. 201.
[3] 52 Am. Dec. 352.
[4] 71 Am. Dec. 49.
[5] 59 Am. St. Rep. 746.
[6] 53 Am. St. Rep. 262.
[7] 42 Am. Rep. 62.
[8] 31 Am. Rep. 114.

[9] 37 Am. Rep. 265.
[10] 25 Am. St. Rep. 545.
[11] 16 Am. Rep. 419.
[12] 43 Am. Rep. 569.
[13] 41 Am. Rep. 178.
[14] 6 Am. Rep. 100.
[15] 6 Am. Rep. 157.

N. Y. 16;[1] *Phelps* v. *Nowlen,* 72 N. Y. 39;[2] *Bloodgood* v. *Ayers,* 108 N. Y. 400;[3] *Frazier* v. *Brown,* 12 Ohio St. 300; *Elster* v. *Springfield,* 49 Ohio St. 100; *Taylor* v. *Welch,* 6 Or. 199; *Sullivan* v. *Mining Co.,* 11 Utah, 441; *Crescent Min. Co.* v. *Silver King Min. Co.,* 17 Utah, 444, 451;[4] *Willow Creek Irr. Co.* v. *Michaelson,* 21 Utah, 248;[5] *Chatfield* v. *Wilson,* 28 Vt. 49; 31 Vt. 357; *Harwood* v. *Benton,* 32 Vt. 742, 737; *Wheelock* v. *Jacobs,* 70 Vt. 162;[6] *Miller* v. *Black Rock etc. Co.,* 99 Va. 747;[7] *Meyer* v. *Tacoma L. and P. Co.,* 8 Wash. 144, 147; *Acton* v. *Blundell,* 12 Mees. & W. 324; *New River Co.* v. *Johnson,* 2 El. & E. 405.)

SHAW, J.—A rehearing was granted in this case for the purpose of considering more fully, and by the aid of such additional arguments as might be presented by persons not parties to the action, but vitally interested in the principle involved, a question that is novel and of the utmost importance to the application to useful purposes of the waters which may be found in the soil.

Petitions for rehearing were presented not only in behalf of the defendant, but also on behalf of a number of corporations engaged in the business of obtaining water from wells and distributing the same for public and private use within this state, and particularly in the southern part thereof. Able and exhaustive briefs have been filed on the rehearing. The principle decided by the late Justice Temple in the former opinion, and the course of reasoning by which he arrived at the conclusion, have been attacked in these several briefs and petitions with much learning and acumen. It is proper that we should here notice some of the objections thus presented.

It is urged, in the first place, that the decision goes beyond the case that was before the court; that the pleadings stated a cause of action solely for the diversion of water from an alleged underground stream, and that, therefore, there was no occasion for a discussion of the principles governing the rights to waters of the class usually denominated percolating waters. The proposition is not tenable. The complaint, in substance,

---

[1] 25 Am. Rep. 125.

[2] 28 Am. Rep. 93.

[3] 2 Am. St. Rep. 443.

[4] 70 Am. St. Rep. 810.

[5] 81 Am. St. Rep. 687.

[6] 67 Am. St. Rep. 659, and note.

[7] 86 Am. St. Rep. 924.

states that the plaintiffs had wells upon their respective tracts
of land, from which water flowed to the surface of the ground;
that the water was necessary for domestic use and irrigation on
the lands on which they were situate; that the defendant, by
means of other wells and excavations upon another tract of
land in the vicinity prevented any water from flowing through
the plaintiffs' wells to their premises, and that this was done
by drawing off the water through the wells of the defendant,
taking it to a distant tract and there using it. If the principle
is correct that the defendant cannot thus, and for this purpose,
take from the plaintiffs' wells the percolating waters from
which they are supplied, then no further allegations were ne-
cessary, and the averment that the water constituted part of
an underground stream may be regarded as surplusage. The
complaint was thus treated in the opinion of Justice Temple,
and he properly considered the question whether or not,
eliminating the surplus allegation that there was an under-
ground stream, the complaint stated a cause of action which
was sustained by the evidence. The fact that the court below
supposed that the existence of a stream of water was neces-
sary to make the diversion of the water an actionable wrong
does not limit this court to the same view, if it be erroneous.
If enough of the facts which are set forth in the complaint are
established by the evidence, without substantial conflict, to
constitute a good cause of action, then the nonsuit should not
have been granted, although other allegations are not proven.

Many arguments, objections, and criticisms are presented
in opposition to the rules and reasoning of the former opinion.
It is contended that the rule that each landowner owns abso-
lutely the percolating waters in his land, with the right to
extract, sell, and dispose of them as he chooses, regardless of
the results to his neighbor, is part of the common law, and as
such has been adopted in this state as the law of the land by
the statute of April 13, 1850, (Stats. 1850, 219,) and by
section 4468 of the Political Code, and that, consequently,
it is beyond the power of this court to abrogate or change it;
that the question comes clearly within the doctrine of *stare
decisis;* that the rule above stated has become a rule of prop-
erty in this state upon the faith of which enormous invest-
ments have been made, and that it should not now be departed

from, even if erroneous; that even if the question were an open one, the adoption of the doctrine of correlative rights in percolating waters would hinder or prevent all further developments or use of underground waters, and endanger or destroy developments already made, thus largely restricting the productive capacity and growth of the state, and that, therefore, a sound public policy and regard for the general welfare demand the opposite rule; that the doctrine of reasonable use of percolating waters would require an equitable distribution thereof among the different landowners and claimants who might have rights therein, that this would throw upon the courts the duty and burden of regulating the use of such waters and the flow of the wells or tunnels, which would prove a duty impossible of performance; and, finally, that if this rule is the law as to percolating waters, it must for the same reason be the law with regard to the extraction of petroleum from the ground, and, if so, it would entirely destroy the oil development and production of this state, and for that reason also that it is against public policy and injurious to the general welfare.

The idea that the doctrine contended for by the defendant is a part of the common law adopted by our statute, and beyond the power of the court to change or modify, is founded upon a misconception of the extent to which the common law is adopted by such statutory provisions, and a failure to observe some of the rules and principles of the common law itself. In *Crandall* v. *Woods*, 8 Cal. 143, the court approved the following rule, quoting from the dissenting opinion of Bronson, J., in *Starr* v. *Child*, 20 Wend. 159: "I think no doctrine better settled than that such portions of the law of England as are not adapted to our condition form no part of the law of this state. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as are framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason to a case where that reason utterly fails." This quotation was subsequently approved by the New York court of appeals. (*People* v. *Appraisers*, 33 N. Y. 461.) The same doctrine was followed in

the case of *English* v. *Johnson,* 17 Cal. 116.[1]  In Pennsyl-
vania and West Virginia, under similar statutes, it was held
that only such parts of the common law as were applicable
to the local situation of the particular state were in force
(*Carson* v. *Blazer,* 2 Binn. 484;[2] *Powell* v. *Sims,* 5 W. Va. 4[3]),
and this is the rule in all the states upon the question, irre-
spective of statutory adoption. (*Commonwealth* v. *Knowlton,*
2 Mass. 534; *State* v. *Rollins,* 8 N. H. 560; *Pierce* v. *State,*
13 N. H. 542; *Currier* v. *Perley,* 24 N. H. 223; *Dennett* v.
*Dennett,* 43 N. H. 499; *Van Ness* v. *Pacard,* 2 Pet. 144;
*Wheaton* v. *Peters,* 8 Pet. 659; *Bloom* v. *Richards,* 2 Ohio
St. 391.)

The true doctrine is, that the common law by its own prin-
ciples adapts itself to varying conditions, and modifies its own
rules so as to serve the ends of justice under the different
circumstances, a principle adopted into our code by section
3510 of the Civil Code: "When the reason of a rule ceases,
so should the rule itself." This is well stated in *Morgan* v.
*King,* 30 Barb. 16: "We are not bound to follow the letter of
the common law, forgetful of its spirit; its *rule* instead of
its *principle.*  A rule of law applicable to the fresh-water
streams of England may be wholly inapplicable to fresh-
water streams in this country of the same nature and charac-
ter, because of different capacity, or because the adjoining
country may furnish a commerce for them unknown in Eng-
land, and yet be subject to the same principle. If so, the com-
mon law modifies its rules upon its own principles, and
conforms them to the wants of the community, the nature,
character, and capacity of the subject to which they are to be
applied." In *Beardsley* v. *Hartford,* 50 Conn. 542,[4] the court
says: "It is a well-settled rule that the law varies with the
varying reasons on which it is founded. This is expressed
by the maxim: '*Cessante ratione, cessat ipsa lex.*' This means
that no law can survive the reasons on which it is founded.
It needs no statute to change it; it abrogates itself. If the
reasons on which a law rests are overborne by opposing
reasons, which, in the progress of society, gain controlling
force, the old law, though still good as an abstract principle,

[1] 76 Am. Dec. 574.                    [3] 13 Am. Rep. 629.
[2] 4 Am. Dec. 463.                     [4] 47 Am. Rep. 677.

and good in its application to some circumstances, must cease to apply or to be a controlling principle to the new circum- stances.'' Accordingly, in many instances in this country, in states where the common law is held to be in force, some of its rules are held to be not applicable to the conditions dif- ferent from the place of its origin. (*Connolly* v. *Goodwin,* 5 Cal. 221; *Ricketts* v. *Johnson,* 8 Cal. 36; *United States* v. *McCarthy,* 18 Fed. 89; 21 Blatchf. 469; *Bovard* v. *Kettering,* 101 Pa. St. 185; *Haywood* v. *Shreve,* 44 N. J. L. 96; *Green* v. *Liter,* 8 Cranch, 249; *Cole* v. *Lake,* 54 N. H. 286; *Pettingill* v. *Rideout,* 6 N. H. 454;[1] *Boston and W. R. C.* v. *Dana,* 1 Gray, 97; *Lindsley* v. *Coats,* 1 Ohio, 243; *Stoever* v. *Whitman,* 6 Binn. 420; *Dawson* v. *Coffman,* 28 Ind. 223; *Wagner* v. *Bissell,* 3 Iowa, 496; *Reaume* v. *Chambers,* 22 Mo. 54; *Seeley* v. *Peters,* 10 Ill. 130; *Collins* v. *Chartiers V. G. Co.,* 131 Pa. St. 143,[2] in which case this same doctrine of the absolute ownership in percolating water was modified; *Harris* v. *Har- rison,* 93 Cal. 676, and *Wiggins* v. *Muscupaibe Co.,* 113 Cal. 182,[3] in which last-mentioned cases the common law respecting riparian rights was said to have been modified in this state to suit our peculiar conditions.) Whenever it is found that, owing to the physical features and character of this state, and the peculiarities of its climate, soil, and productions, the application of a given common-law rule by our courts tends constantly to cause injustice and wrong, rather than the ad- ministration of justice and right, then the fundamental prin- ciples of right and justice on which that law is founded, and which its administration is intended to promote, require that a different rule should be adopted, one which is calculated to secure persons in their property and possessions, and to preserve for them the fruits of their labors and expenditures. The question whether or not the rule contended for is a part of the common law applicable to this state depends on whether it is suitable to our conditions under the rule just stated.

It is necessary, therefore, to state the conditions existing in many parts of this state which are different from those existing where the rule had its origin.

[1] 25 Am. Dec. 473.          [3] 54 Am. St. Rep. 337.
[2] 17 Am. St. Rep. 791.

In a large part of the state, and in almost all of the southern half of it, particularly south of the Tehachapi range of mountains, aside from grains, grasses, and some scant pasturage, there is practically no production by agriculture except by means of artificial irrigation. In a few places favored by nature crops are nourished by natural irrigation, due to the existence underneath the ordinary soil of a saturated layer of sand or gravel, but these places are so few that they are of no consequence in any general view of the situation. Irrigation in these regions has always been customary, and under the Spanish and Mexican governments it was fostered and encouraged. Even in the earlier periods of the settlement of the country, after its acquisition by the United States, and while the population was sparse and scattered compared to the present time, the natural supply of water from the surface streams, as diverted and applied by the crude and wasteful methods then used, was not considered more than was necessary. As the population increased, better methods of diversion, distribution, and application were adopted, and the streams were made to irrigate a very much larger area of land. While this process was going on a series of wet years augmented the streams, and still more land was put under the irrigating systems. Recently there has followed another series of very dry years, which has correspondingly diminished the flow of the streams. After this period began it was soon found that the natural streams were insufficient. The situation became critical, and heavy loss and destruction from drought was imminent. Still the population continued to increase, and with it the demand for more water to irrigate more land. Recourse was then had to the underground waters. Tunnels were constructed, more artesian wells bored, and finally pumps driven by electric or steam power were put into general use to obtain sufficient water to keep alive and productive the valuable orchards planted at the time when water was supposed to be more abundant. The geological history and formation of the country is peculiar. Deep borings have shown that almost all of the valleys and other places where water is found abundantly in percolation were formerly deep cañons or basins, at the bottoms of which anciently there were surface streams or lakes. Gravel, bowlders, and occa-

sionally pieces of driftwood have been found near the coast
far below tide-level, showing that these sunken stream-beds
were once high enough to discharge water by gravity into the
sea.   These valleys and basins are bordered by high moun-
tains, upon which there falls the more abundant rain.   The
deep cañons or basins in course of ages have become filled
with the washings from the mountains, largely composed of
sand and gravel, and into this porous material the water now
running down from the mountains rapidly sinks and slowly
moves through the lands by the process usually termed perco-
lation, forming what are practically underground reservoirs.
It is the water thus held or stored that is now being taken to
eke out the supply from the natural streams.   In almost every
instance of a water supply from the so-called percolating
water, the location of the well or tunnel by which it is collected
is in one of these ancient cañons or lake basins.   Outside of
these there is no percolating water in sufficient quantity to be
of much importance in the development of the country or of
sufficient value to cause serious litigation.   It is usual to speak
of the extraction of this water from the ground as a develop-
ment of a hitherto unused supply.   But it is not yet demon-
strated that the process is not in fact, for the most part, an
exhaustion of the underground sources from which the surface
streams and other supplies previously used have been fed and
supported.   In some cases this has been proven by the event.
The danger of exhaustion in this way threatens surface streams
as well as underground percolations and reservoirs.   Many
water companies, anticipating such an attack on their water
supply, have felt compelled to purchase, and have purchased,
at great expense, the lands immediately surrounding the
stream or source of supply, in order to be able to protect and
secure the percolations from which the source was fed.   Owing
to the uncertainty in the law, and the absence of legal protec-
tion, there has been no security in titles to water-rights.   So
great is the scarcity of water under the present demands and
conditions that one who is deprived of water which he has
been using has usually no other source at hand from which he
can obtain another supply.

The water thus obtained from all these sources is now used
with the utmost economy, and is devoted to the production of

citrus and other extremely valuable orchard and vineyard crops. The water itself, owing to the tremendous need, the valuable results from its application, and the constant effort to plant more orchards and vineyards to share in the great profits realized therefrom, has become very valuable. In some instances it has been known to sell at the rate of fifty thousand dollars for a stream flowing at the rate of one cubic foot per second. Notwithstanding the great drain on the water supply, the economy in the distribution and application, and the much larger area of land thereby brought under irrigation, there still remain large areas of rich soil which are dry and waste for want of water. This abundance of land, with the scarcity and high price of water, furnish a constant stimulus to the further exhaustion of the limited amount of underground water, and a constant temptation to invade sources already appropriated. The charms of the climate have drawn, and will continue to draw, immigrants from the better classes of the eastern states, composed largely of men of experience and means, energetic, enterprising, and resourceful. With an increasing population of this character, it is manifest that nothing that is possible to be done to secure success will be left undone, and that there must ensue in years to come a fierce strife, first to acquire and then to hold every available supply of water.

It is scarcely necessary to state the conditions existing in other countries referred to, to show that they are vastly different from those above stated. There the rainfall is abundant, and water, instead of being of almost priceless value, is a substance that in many instances is to be gotten rid of rather than preserved. Drainage is there an important process in the development of the productive capacity of the land, and irrigation is unknown. The lands that from their situation in this country are classed as damp lands would in those countries be either covered by lakes or would be swamps and bogs. If one is deprived of water in those regions, there is usually little difficulty in obtaining a sufficient supply near by, and at small expense. The country is interlaced with streams of all sizes from the smallest brooklet up to large navigable rivers, and the question of the water supply has but little to do with the progress or prosperity of the country.

It is clear also that the difficulties arising from the scarcity of water in this country are by no means ended, but, on the contrary, are probably just beginning. The application of the rule contended for by the defendants will tend to aggravate these difficulties rather than solve them. Traced to its true foundation, the rule is simply this: that owing to the difficulties the courts will meet in securing persons from the infliction of great wrong and injustice by the diversion of percolating water, if any property right in such water is recognized, the task must be abandoned as impossible, and those who have valuable property acquired by and dependent on the use of such water must be left to their own resources to secure protection for their property from the attacks of their more powerful neighbors, and failing in this, must suffer irretrievable loss; that might is the only protection.

> " The good old rule
> Sufficeth them, the simple plan,
> That they should take who have the power,
> And they should keep who can."

The field is open for exploitation to every man who covets the possessions of another or the water which sustains and preserves them, and he is at liberty to take that water if he has the means to do so, and no law will prevent or interfere with him or preserve his victim from the attack. The difficulties to be encountered must be insurmountable to justify the adoption or continuance of a rule which brings about such consequences.

The claim that the doctrine stated by Mr. Justice Temple is contrary to all the decisions of this court is not sustained by an examination of the cases. The decisions have not been harmonious, and in many of them what is said on this subject is mere *dictum.* A brief review of the cases will demonstrate this to be true. In *Hanson* v. *McCue,* 42 Cal. 303,[1]—the first case on the subject,—it was not necessary for the court to say anything at all with respect to the right of a landowner to complain of a diversion of percolating waters. McCue's predecessor had made a ditch leading from a spring on his land across a tract of land belonging to Hanson's predecessor, and terminating upon another tract, also owned by McCue's pre-

---

[1] 10 Am. Rep. 299.

decessor, through which ditch he conducted water from the spring across the Hanson tract to his other land. This ditch in its course over Hanson's land leaked water in such quantities that it collected into a stream, which Hanson used for irrigation. This was the only foundation for the right which Hanson had or claimed to the water. The court properly held that he had no right to the waste water and that McCue was not bound to continue to maintain the artificial stream for Hanson's benefit, but could by any means he chose change the use of the spring and the course of the ditch. The fact that the change was made by intercepting the percolating water which fed the stream was not material to the case, and all that is said as to the right to do so is *dictum*. The opinion, however, does, though unnecessarily, announce and approve the doctrine contended for by the respondent here. *Huston* v. *Leach*, 53 Cal. 262, decides only that the phrase "waters of said springs," in the decree of the court meant defined streams running into or issuing from the springs, and did not include the percolations which fed the springs. *Hale* v. *McLea*, 53 Cal. 578, referred to a well-defined though very small underground stream, flowing through fissures in the rocks, and has no relation to ordinary percolating water. The court held that the defendant could not cut off the entire stream, and at most could only use a reasonable portion thereof as an upper riparian owner. In *Cross* v. *Kitts*, 69 Cal. 217,[1] the court in its opinion, again by way of *dictum*, announces the doctrine that the owner of the soil is the absolute owner of the percolating water therein; but the decision is against this doctrine. It is a case of the court announcing one doctrine and deciding the contrary. The plaintiff, through a grant from defendant's predecessor, owned a right to take water on defendant's mining claim by means of a tunnel which served to collect the percolating water into a small stream of two miner's inches, which flowed out of the tunnel and was conducted by pipes to plaintiff's premises. This court decided that the defendant had no right to cut off the percolations which fed the stream issuing from the tunnel, although this was done in the legitimate work of mining his own land. The decision is in direct conflict with the *dictum*

[1] 58 Am. Rep. 558.

in *Hanson* v. *McCue*, 42 Cal. 303,[1] and is in accord with the principles laid down by Justice Temple. It can only be distinguished upon the ground that the defendant was estopped by the grant of his predecessor to use the land so as to destroy the water-right granted—a distinction which is not mentioned or referred to in the opinion. The distinction made in the opinion, and upon which the decision in *Cross* v. *Kitts*, is based, is, that when percolating waters are gathered into a defined stream by means of a tunnel, the stream is property, and as such it is protected by law from injury or destruction by the diversion of such percolating water before it reaches the tunnel. There can be no distinction in law or reason between a stream consisting of percolating waters gathered together by means of a tunnel and one gathered by means of an artesian well. Therefore, the case supports Justice Temple's conclusion. The only point bearing upon the case at bar that was decided in *Painter* v. *Pasadena L. and W. Co.*, 91 Cal. 74, is, that the right of the owner of land to the water percolating therein may be reserved in a grant of the land, and that this right to such reserved water may subsequently be transferred. It does not touch the question of the extent of the right of the landowner to such water, as against the adjoining proprietors or others claiming rights in it. In *Southern Pacific R. R. Co.* v. *Dufour*, 95 Cal. 616, the decision was put upon the ground that the excavation of defendant, which caused the diversion of percolating water of which plaintiff complained, was made upon defendant's own land for the purpose of obtaining the water for the better use of the land, which it was held he had a right to do, although it destroyed the spring or stream claimed by the plaintiff. The *dictum* of *Hanson* v. *McCue* was approved. The decision seems to be in conflict with *Cross* v. *Kitts*, although the latter case is not mentioned. In *Gould* v. *Eaton*, 111 Cal. 639,[2] the court below found that the tunnel complained of gathered and discharged a stream of water of which all except one and forty-three hundredths miner's inches was gathered from percolating waters in the sandstone,

---

[1] 10 Am. Rep. 299.          [2] 52 Am. St. Rep. 201.

which did not come from the channel of the natural stream. It was this excess only which was in issue. The finding that it was percolating water was held to be conclusive upon the appellate court. It appeared that some of the percolating water thus developed would, if not interrupted, have reached the natural stream. The court adopts and approves the *dictum* of *Hanson* v. *McCue,* and holds that the plaintiff had no legal right to enjoin a diminution of the natural stream caused by a diversion of percolating water before it reached the channel. In *Los Angeles* v. *Pomeroy,* 124 Cal. 622, an instruction of the court below stating the *dictum* of *Hanson* v. *McCue,* was criticised by the appellants, not for the reason that it restated that doctrine, but upon the ground that it did not class as percolating waters all such water as might be found in the sand or soil underneath the bed of a stream or adjacent thereto. So far as it restated the doctrine of *Hanson* v. *McCue,* it was favorable to the appellants, and, therefore, they did not object to that part of it. The court held that it was not subject to criticism on the ground that it did not properly define percolating waters. The decision, however, cannot be taken as an approval of the doctrine of *Hanson* v. *McCue.* In so far as that doctrine was stated, it being favorable to appellants, it was not presented for consideration to the appellate court. The objection of the appellants, and the point considered by the appellate court, was that the instruction departed from the rule quoted in *Hanson* v. *McCue.* Inasmuch as the writer of this opinion was also the writer of the instruction under consideration, it may be proper to say that he did not give the instruction because he approved that part of it restating the doctrine of *Hanson* v. *McCue.* The instruction was given because an instruction embodying that doctrine had been requested by the appellants in the case, and the respondents, the plaintiffs, believing that it would not materially affect the verdict, consented that that part should be given in substance, rather than take the chances of a reversal of the case, should the supreme court hold its refusal to be erroneous. The remarks of the court in *Vineland District* v. *Azusa District,* 126 Cal. 494, giving the ordinary definition of percolating waters, and stating the rule contended for by the defendant as apply-

ing thereto, call for no discussion. The court was referring to this solely for the purpose of giving the proper meaning to the word "percolating" as used in the findings, and to show that the word was not there used to designate waters which were not a part of the subterranean stream under consideration. In *Bartlett* v. *O'Connor*, 36 Pac. (Cal.) 513, the defendants, with the intent to injure the plaintiff, attempted to reclaim their lands by drawing off the percolating water through an artificial ditch away from the natural stream. It appeared that this could have been done as well by deepening the natural channel of the stream. It was held to be an unlawful diversion. This comprises all the cases on the subject.

Excluding the cases in which the statement of the doctrine of absolute ownership is *dictum,* and looking to what has been actually decided, we have remaining only *Cross* v. *Kitts,* 69 Cal. 217,[1] holding that the owner of a mining claim, whose predecessor had granted a stream made up of percolating water collected by means of a tunnel, could not, even in the ordinary mining of his own land, interfere with the flow of the percolating water to the tunnel; *Southern Pacific R. R. Co.* v. *Dufour,* 95 Cal. 616, holding that a landowner can divert, for use on his own land, percolating water which feeds a spring rising on the land and flowing to an adjoining owner, although the diversion destroys the spring; *Bartlett* v. *O'Connor,* 36 Pac. (Cal.) 513, holding that such a diversion cannot be made in the process of draining the land for reclamation, where the draining and reclamation can be accomplished by another mode without diminishing the stream, and the mode used is adopted with the intention to injure the lower proprietor; and *Gould* v. *Eaton,* 111 Cal. 639,[2] declaring, in effect, that percolating water may be prevented from reaching a natural stream to the injury of a riparian owner, although the percolations are neither taken for use on the land where the diversion is made, nor in the use or reclamation of the land, but for use on other land distant from both the stream and the percolations. In view of this conflicting and uncertain condition of the authorities, it cannot be successfully claimed that the doctrine of absolute

---

[1] 58 Am. Rep. 558.          [2] 52 Am. St. Rep. 201.

ownership is well established in this state. It is proper to state that in all the opinions which have so readily quoted and approved the supposed common-law rule, that injuries from interference with percolating waters were too obscure in origin and cause, too trifling in extent, and relatively of too little importance, as compared to mining industries and the wants of large cities, to justify or require the recognition by the courts of any correlative rights in such waters, or the redress of such injuries, there has been no notice at all taken of the conditions existing here, so radically opposite to those prevailing where the doctrine arose. It is also to be observed that in some instances in the eastern states, mentioned in the former opinion in this case, the injustice from the diversion of percolating waters has been so glaring and so extensive that the court there was compelled to depart from its previously decided cases and recognize the rights of adjoining owners.

We do not see how the doctrine contended for by defendant could ever become a rule of property of any value. Its distinctive feature is the proposition that no property rights exist in such waters except while they remain in the soil of the landowner; that he has no right either to have them continue to pass into his land, as they would under natural conditions, or to prevent them from being drawn out of his land by an interference with natural conditions on neighboring land. Such right as he has is therefore one which he cannot protect or enforce by a resort to legal means, and one which he cannot depend on to continue permanently or for any definite period.

It is apparent that the parties who have asked for a reconsideration of this case, and other persons of the same class, if the rule for which they contend is the law, or no law, of the land, will be constantly threatened with danger of utter destruction of the valuable enterprises and systems of waterworks which they control, and that all new enterprises of the same sort will be subject to the same peril. They will have absolutely no protection in law against others having stronger pumps, deeper wells, or a more favorable situation, who can thereby take from them unlimited quantities of the water, reaching to the entire supply, and without regard to the place

of use. We cannot perceive how a doctrine offering so little protection to the investments in and product of such enterprises, and offering so much temptation to others to capture the water on which they depend, can tend to promote developments in the future or preserve those already made, and, therefore, we do not believe that public policy or a regard for the general welfare demands the doctrine. An ordinary difference in the conditions would scarcely justify the refusal to adopt a rule of the common law, or one which has been so generally supposed to exist; but where the differences are so radical as in this case, and would tend to cause so great a subversion of justice, a different rule is imperative.

The doctrine of reasonable use, on the other hand, affords some measure of protection to property now existing, and greater justification for the attempt to make new developments. It limits the right of others to such amount of water as may be necessary for some useful purpose in connection with the land from which it is taken. If, as is claimed in the argument, such water-bearing land is generally worthless except for the water which it contains, then the quantity that could be used on the land would be nominal, and injunctions could not be obtained, or substantial damages awarded, against those who carry it to distant lands. So far as the active interference of others is concerned, therefore, the danger to such undertakings is much less, and the incentive to development much greater, from the doctrine of reasonable use than from the contrary rule. No doubt there will be inconvenience from attacks on the title to waters appropriated for use on distant lands made by persons who claim the right to the reasonable use of such waters on their own lands. Similar difficulties have arisen and now exist with respect to rights in surface streams, and must always be expected to attend claims to rights in a substance so movable as water. But the courts can protect this particular species of property in water as effectually as water-rights of any other description.

It may, indeed, become necessary to make new applications of old principles to the new conditions, and possibly to modify some existing rules, in their application to this class of property rights; and in view of the novelty of the doctrine, and the scope of argument, it is not out of place to indicate to some extent how it should be done, although otherwise it would

not be necessary to the decision of the case. The controversies arising will naturally divide into classes.

There will be disputes between persons or corporations claiming rights to take such waters from the same strata or source for use on distant lands. There is no statute on this subject, as there now is concerning appropriations of surface streams, but the case is not without precedent. When the pioneers of 1849 reached this state they found no laws in force governing rights to take waters from surface streams for use on non-riparian lands. Yet it was found that the principles of the common law, although not previously applied to such cases, could be adapted thereto, and were sufficient to define and protect such rights under the new conditions. The same condition existed with respect to rights to mine on public land, and a similar solution was found. (*Kelly* v. *Natoma W. Co.*, 6 Cal. 108; *Conger* v. *Weaver*, 6 Cal. 557;[1] *Eddy* v. *Simpson*, 3 Cal. 253;[2] *Hill* v. *Newman*, 5 Cal. 446;[3] *McDonald* v. *Bear River etc. Co.*, 13 Cal. 233.) The principles which, before the adoption of the Civil Code, were applied to protect appropriations and possessory rights in visible streams will, in general, be found applicable to such appropriations of percolating waters, either for public or private use, on distant lands, and will suffice for their protection as against other appropriators. Such rights are usufructuary only, and the first taker who with diligence puts the water in use will have the better right. And in ordinary cases of this character the law of prescriptive titles and rights and the statute of limitations will apply.

In controversies between an appropriator for use on distant land and those who own land overlying the water-bearing strata, there may be two classes of such landowners: those who have used the water on their land before the attempt to appropriate, and those who have not previously used it, but who claim the right afterwards to do so. Under the decision in this case the rights of the first class of landowners are paramount to that of one who takes the water to distant land; but the landowner's right extends only to the quantity of water that is necessary for use on his land, and the ap-

---

[1] 65 Am. Dec. 528.     [3] 63 Am. Dec. 140.
[2] 58 Am. Dec. 408.

propriator may take the surplus. As to those landowners who begin the use after the appropriation, and who, in order to obtain the water, must restrict or restrain the diversion to distant lands or places, it is perhaps best not to state a positive rule until a case arises. Such rights are limited at most to the quantity necessary for use, and the disputes will not be so serious as those between rival appropriators.

Disputes between overlying landowners, concerning water for use on the land, to which they have an equal right, in cases where the supply is insufficient for all, are to be settled by giving to each a fair and just proportion. And here again we leave for future settlement the question as to the priority of rights between such owners who begin the use of the waters at different times. The parties interested in the question are not before us.

In addition, there are some general rules to be applied. In cases involving any class of rights in such waters, preliminary injunctions must be granted, if at all, only upon the clearest showing that there is imminent danger of irreparable and substantial injury, and that the diversion complained of is the real cause. Where the complainant has stood by while the development was made for public use, and has suffered it to proceed at large expense to successful operation, having reasonable cause to believe it would affect his own water supply, the injunction should be refused and the party left to his action for such damages as he can prove. (*Fresno etc. Co.* v. *Southern Pacific Co.,* 135 Cal. 202; *Southern California Ry. Co.* v. *Slauson,* 138 Cal. 342.[1]) If a party makes no use of the water on his own land, or elsewhere, he should not be allowed to enjoin its use by another who draws it out or intercepts it, or to whom it may go by percolation, although perhaps he may have the right to a decree settling his right to use it when necessary on his own land, if a proper case is made.

The objection that this rule of correlative rights will throw upon the court a duty impossible of performance, that of apportioning an insufficient supply of water among a large number of users, is largely conjectural. No doubt cases can be imagined where the task would be extremely difficult, but

[1] 94 Am. St. Rep. 58.

if the rule is the only just one, as we think has been shown, the difficulty in its application in extreme cases is not a sufficient reason for rejecting it and leaving property without any protection from the law.

It does not necessarily follow that a rule for the government of rights in percolating water must also be followed as to underground seepages or percolations of mineral oil. Oil is not extracted for use in agriculture, or upon the land from which it is taken, but solely for sale as an article of merchandise, and for use in commerce and manufactures. The conditions under which oil is found and taken from the earth in this state are in no important particulars different from those present in other countries where it is produced. There is no necessary parallel between the conditions respecting the use and development of water and those affecting the production of oil. Whether in a contest between two oil-producers concerning the drawing out by one of the oil from under the land of the other we should follow the rule adopted by the courts of other oil-producing states, or apply a rule better calculated to protect oil not actually developed, is a question not before us and which need not be considered.

With regard to the doctrine of reasonable use of percolating waters, we adhere to the views expressed in the former opinion.

The judgment of the court below is reversed and a new trial ordered.

McFarland, J., Van Dyke, J., Henshaw, J., Lorigan, J., and Beatty, C. J., concurred.

ANGELLOTTI, J., concurring.—I concur in the judgment and in the views expressed in the opinion of Mr. Justice Temple on the former decision of this case as to the application of the doctrine of reasonable use to percolating waters. When properly applied, it appears clear to me that such doctrine will serve to protect the rights of the owner of realty rather than impair them.

I also concur generally in the views expressed by Mr. Justice Shaw in the majority opinion as to the same subject-matter, but several important questions are discussed that

are not necessary to a decision of this case, and as to which the opinion herein cannot hereafter be considered as authority. As to such matters I refrain from expressing any opinion.

The following is the opinion of the court rendered in Bank on the former hearing, per Temple, J., November 7, 1902, referred to in the above opinion on rehearing:—

TEMPLE, J.—This appeal is taken from a judgment of nonsuit, entered against plaintiffs on motion of defendant.

The action was brought to enjoin defendant from drawing off and diverting water from an artesian belt, which is in part on or under the premises of plaintiffs, and to the water of which they have sunk wells, thereby causing the water to rise and flow upon the premises of plaintiffs, and which they aver had constantly so flowed for twenty years before the wrong complained of was committed by defendant. The water is necessary for domestic purposes and for irrigating the lands of plaintiffs, upon which there are growing trees, vines, shrubbery, and other plants, which are of great value to plaintiffs. All of said plants will perish, and plaintiffs will be greatly and irreparably injured if the defendant is allowed to divert the water.

These facts are admitted, and further, that defendant is diverting the water for sale, to be used on lands of others distant from the saturated belt from which the artesian water is derived.

The plaintiffs contend that this subsurface water constitutes an underground stream, and that plaintiffs are riparian thereto, and as such riparian owners they are seeking relief in this case.

The defendant denies that she is taking or diverting water from an underground stream or watercourse, and alleges that all the water which rises in the artesian wells on her premises, and which she is selling, is percolating water, and is parcel of her premises, and her property.

In effect, therefore, while denying that she is doing any act of which plaintiffs can complain, she really only denies that she is diverting water from an underground watercourse, and asserts her right to dispose of the water in the manner

alleged, because it is percolating water, not confined to a definite watercourse.

The court sustained that proposition, and for that reason granted defendant's motion for nonsuit.

The so-called artesian belt includes several square miles of territory. It is a large accumulation of earth upon the base of very high mountains, and is composed of detritus of varying quantity and material with no regular stratification. Wells have been sunk at least to the depth of seven hundred and fifty feet, but no bed-rock has been found. It has quite an incline from the mountain, and is from seven hundred to fifteen hundred feet above sea-level. Mr. F. C. Finkle, a civil engineer, was the chief witness for the plaintiffs, and testified both as to facts palpable to the senses and as an expert. He says the saturated land is fed, first, by the underflow from the numerous ravines, cañons, and streams which enter the valley from the mountains; and secondly, by the rain and flood-water upon, and absorbed upon the slope and between the artesian belt and the mountains. This water percolating down into the soil, and constantly pressed forward by water accumulating, finally gets under partially impervious earth, where it is held under sufficient pressure to create the artesian belt. The banks of this supposed subsurface stream, the witness thought, were on the west, "a cemented dyke which runs through the valley, and the eastern boundary of it is the clay bank or dyke at the south side of the Santa Ana River." Within these limits many ravines enter from the mountains, some of them carrying at times great quantities of water, much of which had been appropriated and carried off in pipes or cemented aqueducts.

It is evident that if there is any flow to this underground body of water thus held under pressure, it is by percolation. The witness stated that the process was the same the world over. The lower lands are saturated from above. "It is done by saturation from the rainfalls and the floods, and percolation through voids in the soil."

It is quite manifest that this body (if it can be so styled) of percolating water cannot be called an underground water-course to which riparian rights can attach, unless we are prepared to abolish all distinction between percolating water and

the water flowing in streams with known or ascertainable banks which confine the water to definite channels. All rainwater which falls upon the hills and mountain-sides which does not flow off at once as surface water is absorbed and percolates down in the same way to the valley below. No doubt limits can be found to every such flow, as in this case. The distinction is well established, and, in some respects, different rules of law applied to the two cases. The plaintiffs, therefore, cannot establish their claims upon the theory of an underground watercourse to which they are riparian.

But appellants contend that though they are not riparian to an underground watercourse, and although the saturated belt carries only percolating water, still they are entitled to the injunction prayed for.

The defense, conceding that the water held in the earth is percolating water, relies upon certain decisions, which assert and apply literally the maxim, *Cujus est solum ejus est usque ad inferos.* And that water percolating in the ground, or held there in saturation, belongs to the landowners as completely as do the rocks, ground, and other material of which the land is composed, and therefore he may remove it and sell it, or do what he pleases with it. He cites as authority for the proposition, *Hanson* v. *McCue,* 42 Cal. 303;[1] *Southern Pacific R. R. Co.,* v. *Dufour,* 95 Cal. 616; *Gould* v. *Eaton,* 111 Cal. 641;[2] and *City of Los Angeles* v. *Pomeroy,* 124 Cal. 597.

It is obvious at once that the analogy between the right to remove sand and gravel from the land for sale and to remove and sell percolating water is not perfect. If we suppose a saturated plain, one may remove and sell the sand and gravel from his land without affecting or diminishing the sand and gravel on the lands of his neighbors. If the water on his lands is his property, then the water in the soil of his neighbors is their property. But when he drains out and sells the water on his land, he draws to his land, and also sells, water which is the property of his neighbor. And the effect is similar in other respects. By pumping out the water from his lands he can perhaps deprive his neighbors of water for domestic uses, and, in fact, render their land valueless. In

---

[1] 10 Am. Rep. 299.          [2] 52 Am. St. Rep. 201.

short, the members of the community, in the case supposed, have a common interest in the water. It is necessary for all, and it is an anomaly in the law if one person can for his individual profit destroy the community and render the neighborhood uninhabitable.

We have derived our law, in respect to subterranean waters, as in other respects, mostly from England, but in regard to this matter the first cases are quite modern. Even yet the text-books on water-rights have but little to say upon the subject of percolating water. Such law as has been made upon the subject comes from countries and climates where water is abundant, and its conservation and economical use of little consequence as compared with a climate like southern California. The learned counsel for appellants state in their brief that water at San Bernardino is worth one thousand dollars per inch of flow. Percolating water, or water held in the earth, is the main source of supply for domestic uses, and for irrigation, without which most lands are unproductive. It is also stated that speculators are seeking to appropriate the percolating water, by getting title to some part of a watershed or slope, and by running canals and tunnels, and by sinking, to obtain water for sale. It is asserted that the lands naturally made moist by percolating water are very productive, and were first settled upon, and have been most highly improved; and he asks whether these lands are to be converted into deserts because speculators may pump and carry away to some distant locality the subsurface waters which rendered the land fertile. Certainly no such case as this has come before a court, or could well exist in England, or in the eastern states.

It is often asserted that *Acton* v. *Blundell*, 12 Mees. & W. 324, decided in Exchequer Chamber, in 1843, was the first case in England in regard to percolating water. This shows how unimportant, relatively, the subject is in England. It was an action for damages occasioned by working a coal-mine on adjoining land, which interfered with water which was flowing underground to plaintiff's spring. The court instructed the jury, "that if the defendants had proceeded and acted in the usual and proper manner in the land for the purpose of working and mining a coal-mine therein, they might law-

fully do so.'' This instruction was held to be correct, and that is the real force and effect of the decision. But the chief justice pointed out some respects in which the right to water flowing in an open visible stream differs from an underground flow by percolation. The main difference, so far as concerns the question under consideration, was, that percolation was occult, the regulation of which was a difficult matter. One who disturbed the course of percolating water by digging upon his own land could not tell whether he would drain his neighbor's well, nor could the person injured demonstrate that such was the cause of the injury. So, too, when one diverts water from a visible stream, the fact and the effect are at once known, while as to percolating water its course may be obstructed or changed without the intent to do so, and without knowing that such would be the effect of what was done. His lordship, the case being one of first impression, quotes a passage from a civil-law writer to the effect that when one digging upon his own land drains his neighbor's well, such neighbor has no cause of action: *Si non animo vicini nocendi, sed suum agrum meliorem faciendi, id fecit.* His lordship, however, although the case did not require it, disregarded the qualifications found in the civil law, and held that the case was not governed by law which applies to flowing streams, ''but that it rather falls within that principle which gives to the owner of the soil all that lies beneath the surface; that the land immediately below is his property, whether it is solid rock, or pervious ground, or venous earth, or part soil and part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of this right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria,* which cannot become the ground of an action.''

This statement has been frequently quoted, both in England and in this country, and has been generally adopted as a correct statement of the law upon the subject. In *Acton v. Blundell,* 12 Mees. & W. 324, as has been said, the working of a mine upon an adjoining estate drained certain springs

on plaintiff's land. It would have been sufficient to defeat plaintiff's action to have said that the working of a coal-mine in a proper manner is a reasonable use of land, and that it was without malice or an intent to injure plaintiff. It is a general rule—in fact a universal principle of law—that one may make reasonable use of his own property, although such use results in injury to another. But the maxim, *Cujus est solum, ejus est usque ad inferos,* furnishes a rule of easy application, and saves a world of judicial worry in many cases. And perhaps in England and in our eastern states a more thorough and minute consideration of the equities of parties may not often be required. The case is very different, however, in an arid country like southern California, where the relative importance of percolating water and water flowing in definite watercourses is greatly changed.

And it seems to me a great mistake is made in supposing that if the plenary property of a landowner in percolating water is denied, the alternative is to apply to such water all the rules which apply to the use of water flowing in watercourses having defined channels. The entire argument for what may be called the *cujus est solum* doctrine consists in showing that some recognized regulation of riparian rights would be inapplicable. It is said, for instance, that the law of riparian rights requires each proprietor to permit the water to flow as it was accustomed to flow. Apply this rule to subsurface water, and no one could drain his land, for he thereby prevents the water from flowing as it was accustomed to flow by percolation to his neighbor. The common-law method in the supposed case would be to apply the principle to the new case, although some judge-made rule as to how it shall be applied might stand in the way. The principle is clearly applicable. A riparian owner may not divert the water because he would thereby injure his neighbors who have equal rights in the stream. Still he may take a reasonable amount from the stream for domestic purposes, and that may equal the entire flow, although he thereby injures his neighbors. It is a question of reasonable use, and that applies both to the land of the person disturbing the percolation and to adjoining land. He may cultivate his land, and for that purpose

ordinarily may drain it, and plow it, or clear it from forests, although all these operations may affect the flow of water to the lower proprietor, both in the watercourse and by percolation. He was allowed to become the owner for those purposes, and with the understanding that all other proprietors have the same right to use their land. The maxim, *Sic utere,* etc., plainly applies as between such proprietors, very much as it does between different riparian proprietors upon the same stream.

The title to all land is held subject to this maxim. Such ownership is "but an aggregation of qualified principles the limits of which are prescribed by the equality of rights, and the correlation of rights and obligations necessary for the highest use of land by the entire community of proprietors." (*Thompson* v. *Androscoggin etc. Co.,* 54 N. H. 545.)

Proprietary rights are limited by the common interests of others,—that is, to a reasonable use,—and such use one may make of his land, though it injures others. This proposition is generally recognized, but for some reason has not always been recognized by the courts when considering the subject of percolating water, although all rights in respect to water are peculiarly within its province.

This rule of reasonable use answers most effectually the main argument against recognizing any modification of the *cujus est solum* doctrine as applied to percolating water, although in a majority of the cases which are claimed as authority against the rule of reasonable use the court takes pains to note that the act which disturbs the percolating water was in using the land in the usual manner and without the intent of injuring a neighbor.

Among the English cases, *Chasemore* v. *Richards,* was most carefully considered. The village of Croydon was situated upon an extensive plain near the head-waters of the river Waundale, and a goodly portion of the permanent flow of the river came by percolation from this plain.

The village had caused a large well to be dug about a quarter of a mile from the river, and was pumping from it five or six hundred thousand gallons of water daily for the use of the town. Plaintiff was a riparian proprietor upon the river below, and had a mill which was operated by the waters

of the river.    The pumping naturally diminished the flow
and prevented the use of the mill as efficiently as before.    All
the facts were admitted or found to exist.

The case was first decided in Exchequer Chambers in favor
of the defendant, Mr. Justice Coleridge dissenting.    (2 Hurl.
& N. 168.)    The dissenting opinion presents the doctrine of
reasonable use.

The case was taken to the House of Lords.    (7 H. L. Cas.
349.)    There the case was most elaborately and ably argued,
and the view in regard to reasonable use was fully presented.
A case was made and the opinion of the judges was solicited.
The judges held unanimously for the defendant, sustaining
fully the *cujus est solum* doctrine without qualification, and
this was affirmed by the house.    The matter mainly discussed,
however, was the plaintiff's claim that he had a prescriptive
right to the water.    The court held that riparian rights are
not derived by prescription, but the right to the water is
*ex jure naturæ.*    This settled the main contention, and little
more was said, except to refer to the cases in which the
rights to percolating waters are discussed.    Lord Wensley-
dale, however, who had doubts, pronounced an opinion which
seems to me in accord with the views I am trying to express.

The doctrine of reasonable use has been recognized in
many cases in the United States,—impliedly in most, as I
have stated, but expressly in some.

*Wheatley* v. *Baugh,* 25 Pa. St. 528,[1] is one of these, and
is remarkable in that the court states as strongly as possible,
and with approbation, the *cujus est solum* doctrine.    It is
even said that the opposite doctrine (applying to such water
the rule as to riparian rights) would amount to total abroga-
tion of the rights of property.    It is said one could not clear
or cultivate his land or build a house without interfering
with percolating water; and even if rights were admitted
to exist, the difficulty of enforcing them would be insurmount-
able.    I think I have shown that the admitted right to a
reasonable use of the land and of the water answers all these
objections.    To my mind this is so obvious that I can but
wonder that such objections have ever troubled the judici-
ary.    And yet, notwithstanding this insistence upon the rule

[1] 64 Am. Dec. 721, and note.

CXLI. Cal.—10

which apparently ignores all equities of others than the owner of the soil in which the water is found, the court felt obliged to, and did, in unequivocal words, declare that the use of it must be reasonable. The proprietor may make a reasonable use of his own land, although in so doing he obstructs or changes the percolation of water to or from his neighbor's land.

But by far the most satisfactory case upon the subject is *Bassett* v. *Salisbury Mfg. Co.*, 43 N. H. 569.[1] That was a most elaborately considered case, and this precise question is discussed with a fullness and ability which I am not so vain as to think I could improve upon. I would like to transcribe the entire argument, but as it is accessible to the profession, I need only say I adopt it in full. The decision was approved in *Swett* v. *Cutts*, 50 N. H. 439.[2]

*Smith* v. *City of Brooklyn*, 18 App. Div. 340, 46 N. Y. Supp. 141, was in some ways a counterpart of *Chasemore* v. *Richards*. The city of Brooklyn constructed in Queens County culverts, aqueducts, reservoirs, and conduits, and dug deep trenches to intercept percolating waters, and further sunk in the process earth-wells, and put in pumps to obtain the water with which the soil, which it owned, was saturated. It thus procured for the use of the city a large amount of water. Plaintiff owned a farm distant from these waterworks about twenty-four hundred feet. Upon the land was a small brook, in which he had placed a dam, which he used for purposes of boat-building and for cutting ice. The brook had carried water all the year round. The operations of the defendant rendered this brook entirely dry, and deprived the plaintiff of his income.

Here is a case like that of the village of Croydon. Defendant intercepted percolating water upon its own land before it had reached a watercourse. It did not drain water from a defined stream, but the water was prevented from reaching the stream, which was thereby as effectually destroyed as it could have been by draining the water from it.

Judge Hatch, who wrote the opinion in the appellate division of the supreme court, begins by quoting the prevailing doctrine in regard to percolating water, from *Pixley* v.

---

[1] 82 Am. Dec. 179.          [2] 9 Am. Rep. 276, and note.

*Clark,* 35 N. Y. 520:[1] "An owner of the soil may divert per-
colating water, consume or cut it off with impunity. It is the
same as land, and cannot be distinguished in law from land."
He says this proposition must be admitted, but nevertheless
a case cannot be found in this country "where the right has
been upheld in the owner of land to destroy a stream, a spring,
or a well upon his neighbor's land, by cutting off the source
of its supply, *except it was done in the exercise of a legal
right to improve the land, or make some use of it in connection
with the enjoyment of the land itself."* I have italicized the
last clause, as it contains the qualification found in the civil
law, upon which the English rule is professedly based, and ex-
presses the principle for which I contend. The learned judge
admits that the English cases go further, but says that the
American cases have not gone further.

The learned court gives a concise statement of the reasons
given by the English courts for not applying to percolating
water the same principle which governs the right of riparian
proprietors, and agrees with Justice Coleridge and Lord
Wensleydale that they are insufficient. The court recognized
the right of the landowner to percolating water, but says
the right must be exercised with reference to the equal right
of others in their land. He says one may as well claim the
right to tunnel into his neighbor's land and take out valuable
minerals, as to drain from it water which is also parcel of it,
for sale. The peculiar nature of the property which enables
one to take it by drainage does not justify the taking save
in the usual and reasonable use of his own land,—in other
words, for the proper use and betterment of his own property.

Allusion is made in the opinion to the rule, inconsistent
with the *cujus est solum* doctrine, that you cannot do anything
on your land which will drain water from a visible stream
or natural pond upon the land of another. In *Canal Co.* v.
*Shugaer,* L. R. 6 Ch. App. Cas. 483, Lord Hatherley said:
"You have a right to all the water which you can draw from
the different sources which may percolate underground;
but that has no bearing at all on what you may do with regard
to water which is in a defined channel, and which you are
not to touch. If you cannot get at the underground water

[1] 91 Am. Dec. 72.

without touching the water in a defined surface channel, I think you cannot get at it at all.'' It is well said that this decision cannot stand with *Chasemore* v. *Richards,* even though the court may say that it can.

If a landowner owns the water percolating in his soil, as he does the rock, minerals, and earth, why may he not take it in such a case? And what difference is there in destroying a stream or natural pond by drawing water from it through percolation or by preventing it from flowing into the stream? The effect is the same, and knowledge of the inevitable effect of the act is the same. And this rule would prevent a landowner from draining a marsh, or even from clearing or cultivating his land, when these operations would tend to increase the percolation *from* a stream or natural pond upon a neighbor's land. This is one of the main arguments in support of the doctrine of *Acton* v. *Blundell,* 12 Mees. & W. 324. It seems here strangely to lose its force, as does also another reason for that rule, that when doing such acts the landowner could not reasonably anticipate the injury as probable.

The court expressly applies the doctrine *sic utere tuo* to the case and affirms the judgment against the city.

In the appellate court this judgment was affirmed. (*Smith* v. *City of Brooklyn,* 160 N. Y. 357.) It is there treated, however, as a draining of water from plaintiff's brook and pond. Judge Hatch, in the supreme court, expressly states that defendant simply prevented the water from reaching the brook on plaintiff's farm. Perhaps either view may be taken of the facts. There was an immense saturated plain composed of porous earth. Defendant's wells extended lower down than the bottom of the pond. The stream and pond, and all the springs, wells, and streams in the neighborhood, have been dry ever since the operations of the defendant. Since the water was first drained out, surely there has been no percolation from the stream. This circumstance makes the case more like that in hand. Here was a vast quantity of water held in the soil, which constituted the common supply of many people. The defendant, pumping from wells on its own land, and taking only percolating water, exhausted this common supply. The court held that it could not be. The

reasons would have been much more forceful had the case risen in an arid climate like San Bernardino.

But this question was completely put at rest, so far as the state of New York is concerned, by the case of *Forbell* v. *City of New York,* 164 N. Y. 522.[1]  It was a suit by another plaintiff to restrain the same operations considered in *Smith* v. *City of Brooklyn,* 18 App. Div. 340, 46 N. Y. Supp. 141. Here there was no visible stream or pond on plaintiff's land. His injury was merely that the level of the water held in the soil was lowered to his injury.  In stating the case the court said: ''The city makes merchandise of the large quantities of water which it draws from the wells that it has sunk on its two acres of land.  The plaintiff does not complain that any surface stream or pond or body of water upon his land is thereby affected, but does complain and the courts below have found that the defendant exhausts his land of its accustomed and natural supply of underground or subsurface water, and thus prevents him from growing upon it the crops to which the land was and is peculiarly adapted, or destroys such crops after they are grown or partly grown.''  This statement shows a striking similarity of the issues made in that case to those involved here.

The court proceeds to state the usual doctrine in regard to percolating water and approves the doctrine for the cases in which it is properly applicable.  No doubt the land proprietor owns the water which is parcel of his land, and may use it as he pleases, regard being had to the rights of others. It is not unreasonable that he should dig wells in order to have the fullest enjoyment and usefulness of his estate, or for pleasure, trade, or whatever else the land as land may serve.  ''But to fit it up with wells and pumps of such persuasive and potential reach that from their base the defendant can tap the water stored in the plaintiff's land, and in all the region thereabout, and lead it to his own land, and by merchandising it prevent its return, is, however reasonable it may appear to the defendant and its customers, unreasonable as to the plaintiff, and others whose lands are thus clandestinely sapped and their value impaired.''

Counsel for the plaintiff in that case contended that since

[1] 79 Am. St. Rep. 666.

plaintiff owned the percolating water in his own soil, the unlawful draining of it away by the defendant was a trespass committed on his land. This contention was sustained, both in the supreme court and in the court of appeals. The court further indorsed the opinion of Judge Hatch in *Smith* v. *City of Brooklyn,* from which I have made quotations.

If the principle announced in these cases prevails here, the order granting a nonsuit and the judgment entered thereon must be reversed. It does not require a reversal of the rule laid down in *Acton* v. *Blundell,* which has been so often cited and indorsed, but only a holding that in certain cases there should be added the element of reasonable use, having reference both to the land belonging to the party who has disturbed the movement of percolating water and to adjoining land, and to land sensibly affected by such acts. Whatever the English rule may be the American cases either recognize the application of the rule of *sic utere tuo* to the subject, or they are cases in which it was wholly unnecessary to consider that subject. Such are the California cases. In the case of *City of Los Angeles* v. *Pomeroy,* 124 Cal. 597, the question might have been raised, and in the trial court, it may be, was, and in some of the instructions the rule laid down in *Acton* v. *Blundell* is asserted without qualification. Still this court was not called upon, and did not consider any such question. I think it clear that the American cases do not require us to hold that the maxim *sic utere tuo* does not limit the right of the landowner to the use of the subsurface water, but on the contrary all the cases in which the question has been discussed held, or admit, that such maxim should limit such right where justice requires it. Such, I think, is the proper rule.

It follows that the court erred in granting the nonsuit, and the judgment is therefore reversed and a new trial ordered.

Beatty, C. J., McFarland, J., Van Dyke, J., Harrison, J., and Henshaw, J., concurred.

Rehearing denied.