FRANK W. MEEKER v. THE MAYOR AND CITY COUNCIL OF
EAST ORANGE.

Argued February 19, 1908—Decided July 7, 1908.

1. An action cannot be maintained by a landowner for the appro-
priation by another landowner of percolating underground water,
but for the interception of which by the defendant on his land
would have reached the plaintiff's spring, where such appro-
priation excludes the abstraction of water by the defendant out
of any surface stream, or one flowing in a defined channel
either upon or under the surface of the ground, the rule being
that the absolute right to such percolating underground waters
is in the owner of the fee of the land where they are found.
2. In such case the maxim *sic utere tuo ut alienum non lœdas*
does not apply.

On appeal from the First District Court of Newark.

For the plaintiff, *Guild, Lum & Tamblyn.*

For the defendant, *Jerome D. Gedney.*

The opinion of the court was delivered by

VOORHEES, J.   This is an appeal from the First District
Court of the city of Newark, and by consent was heard before
a single justice pursuant to the statute.   The case was sub-
mitted to the District Court upon the following agreed state
of facts:

"The plaintiff owns and occupies a farm of about one hun-
dred acres, situated in the townships of Millburn and Living-
ston, Essex county, New Jersey, and in the valley of Canoe
brook.

"Plaintiff is a milkman and has used his farm for the
pasture and support of his cows and horses for a number of
years last past.

"Canoe brook flows in a general southwesterly direction
and through the property of plaintiff; there are also two

small streams tributary to Canoe brook which flow through plaintiff's farm. On the plaintiff's farm there is also a spring which is enclosed by a spring house. Plaintiff has used the water of this spring for a number of years last past for drinking purposes and for the storing and keeping of his milk.

"Plaintiff's cattle, in pasture, have for a number of years resorted to Canoe brook and the tributary streams mentioned above for drinking water.

"In January, 1905, the defendant city of East Orange began to take water from a number of artesian wells which it had sunk and constructed upon a tract of land, containing about six hundred and eighty acres, situated in the valley of Canoe brook and in the township of Millburn. These wells of defendant are about twenty in number and are situate about one and one-quarter miles distant from plaintiff's farm and spring. The wells are down stream from the farm, spring and streams of plaintiff and their location is southwesterly from plaintiff's property.

"The said plant of the defendant was installed and the land upon which it is located was purchased by the city of East Orange under the authority of an act of the legislature of the State of New Jersey, entitled 'An act to enable cities to supply the inhabitants thereof with pure and wholesome water,' approved April 21st, 1876, and the acts supplemental thereto and amendatory thereof.

"Defendant city of East Orange has expended more than one million dollars in the construction of its said works, wells and the mains and reservoirs connected therewith.

"As a result of the operation of the defendant's said plant by means of its wells, it has taken percolating underground water, which, but for its interception, would have reached plaintiff's spring or streams, but no water other than percolating underground water has been taken by defendant and no water has been taken by defendant out of any surface stream or the spring of plaintiff after it (the water) has appeared on the surface or in any surface spring or stream."

The question at issue regards the appropriation by the defendant of percolating underground water but for the inter-

ception of which by the defendant would have reached the plaintiff's spring, and excludes the abstraction of water by the defendant out of any surface stream or out of the plaintiff's spring.

Judgment was given in the District Court for the defendant.

The rules of law which are applicable to a stream flowing in a defined channel either upon or under the surface of the ground are not pertinent to this case.

In New Jersey, so far as the subject has been discussed, the rule that the absolute right of such waters is in the owner of the fee, has been adopted. In *Ocean Grove* v. *Asbury Park,* 13 *Stew. Eq.* 447, it is said:

"The courts all proceed upon the ground that waters thus used and diverted (underground waters) are waters which percolate through the earth, and are not distinguished by any certain and well-defined stream, and consequently are the absolute property of the owner of the fee as completely as are the ground, stones, minerals or other matter to any depth whatever beneath the surface. The one is just as much the subject of use, sale or diversion as the other. The owner of a mine encounters innumerable drops of water escaping from every crevice and fissure; these, when collected, interfere with his progress and he may remove them, although the spring or well of the landowner below be diminished or destroyed."

In the case of Harper *v.* Mountain Water Co., former Chancellor Magie, then Chief Justice, at the Circuit, incorporated the following words in his charge to the jury:

"When the owner of land sinks a pit or well and strikes an underground reservoir of water, or flowing underground water, he acquires a certain right to it; the right to use that water; the right to use it, although the sinking of his well and the use of the water from it may have affected somebody else with respect to underground water; and if a neighbor of his sinks another well and thereby affects the flow of his, or, as it is sometimes expressed, 'takes the bottom out of his well,' he is without redress; if it is a wrong, it is not an

actual wrong; if it is an injury, it is an injury without re-
dress by law. This rule applied, therefore, to all percolating
underground waters, and the interception of waters by the
sinking of such pits or wells as affect an underground reser-
voir or underground flow, will not be the cause of any action
on the part of a person whose underground flow or reservoir
to which he has resort before, is affected thereby.

"Now, I am bound to hold in this case, and for the purpose
of this case I do hold, that the like rule applies where an
underground water is struck and intercepted by pits or wells,
which water, if not intercepted, would reach the surface in
springs or ponds and so flow down streams; and if the ab-
straction of such waters will not be an actual wrong, even if
the water so abstracted is used otherwise than in the improve-
ment of the owner's land. So that in this case, and for the
purpose of this case, I charge you that the defendants may
strike underground streams and abstract underground water,
and if they take nothing except by interception of water that
otherwise would have come to the surface, they may even
carry it off and market it and sell it."

This case, in another form, came before Vice Chancellor
Emery in *Harper, Hollingsworth & Darby Co.* v. *Mountain
Water Co.*, 20 *Dick. Ch. Rep.* 479. At page 488 it appears
that the above-mentioned charge came under review by the
Supreme Court on a rule to show cause. This court then
held that the defendants had no ground to complain of the
law as laid down by the trial judge as to their liability, but
that there was proof of an injurious diminution of flow by
abstractions, such as was properly held to be actionable.

In a *dictum* in the case of *McCarter, Attorney-General,* v.
*Hudson County Water Co.*, 4 *Robb.* 695, the Court of Errors
and Appeals, speaking by the present Chancellor, uses the fol-
lowing language:

"We may concede, also, for present purposes, that sub-
terranean waters, such as may be reached only by driving
wells, when thus acquired, become absolutely the property of
the proprietor of the soil, and may be dealt with by him as

merchandise, and that, if they be thus converted into a merchantable commodity, the state would not be permitted to prohibit its transportation beyond the confines of the state. Water thus taken from wells may be placed on the same plain with oil and natural gas."

These rulings have their foundation in the English cases, the leading one being *Chasemore* v. *Richards, 7 H. of L. Cas.* 349. The subject was there fully discussed, and by the unanimous opinion of all the judges it was held that the principles which regulate "the rights of owners of land in respect to water flowing in known and defined channels, whether upon or below the surface of the ground, do not apply to underground water which merely percolates through the strata in no known channels, and that where a landowner and a millowner, who had for above sixty years enjoyed the use of a stream which was chiefly supplied by such percolating underground water, lost the use of the stream after an adjoining owner had dug on his own land an extensive well for the purpose of supplying water to the inhabitants of the district, many of whom had no title as landowners to the use of the water, it was held that such millowner had no right of action."

It will be noticed that the facts in the case under consideration have undoubtedly been patterned after the case last cited, and so closely do they adhere to it, that they present an academic question, rather than a practical situation.

Mr. Justice Wightman, in discussing the question whether the plaintiff in Chasemore *v.* Richards, had a right *jure naturæ* to prevent the defendant from sinking a well in his own ground and so absorbing the water which might otherwise be used for the working of the plaintiff's mill, says:

"It is impossible to reconcile such a right with the natural and ordinary rights of landowners, or to fix any reasonable limits to the exercise of such a right. Such a right as that contended for by the plaintiff would interfere with, if not prevent, the draining of land by the owner. Suppose, as it was put at the bar in argument, a man sank a well upon his

own land, and the amount of percolating water which found
a way into it had no sensible effect upon the quantity of
water in the river which ran to the plaintiff's mill, no action
would be maintainable; but if many landowners sank wells
upon their own lands, and thereby absorbed so much of the
percolating water, by the united effect of all the wells, as
would sensibly and injuriously diminish the quantity of
water in the river, though no one well alone would have that
effect, could an action be maintained against any one of them,
and, if any, which, for it is clear that no action could be
maintained against them jointly."

Lord Chelmsford, in that case, says:

"But the right to percolating underground water is neces-
sarily of a very uncertain description. When does this right
commence? Before or after the rain has found its way to the
ground? If the owner of land through which the water filters
cannot intercept it in its progress, can he prevent its descend-
ing to the earth at all by catching it in tanks or cisterns?
And how far will the right to this water-supply extend?
* * * Are the most distant landowners, as well as the ad-
jacent ones, to be bound, at their peril, to take care to use
their lands so as not to interrupt the oozing of the water
through the soil to a greater extent than shall be necessary
for their own actual wants?"

Lord Cranworth, in the same case, says:

"But if the doctrine (that applied to visible streams) could
be applied to water merely percolating, as it is said, through
the soil and eventually reaching some stream, it would be
always a matter that would require the evidence of scientific
men to state whether or not there had been interruption, and
whether or not there had been injury. It is a process of
nature not apparent, and therefore such percolating water
has not received the protection which water running in a nat-
ural channel on the surface has always received. If the argu-
ment of the plaintiff were adopted, the consequence would be
that every well that ever was sunk would have given rise, or
might give rise, to an action."

The plaintiff insists that the rule *sic utere tuo ut alienum non lædas* should be applied, and that correlative rights in percolating waters should be recognized by the court; that in this way protection would be offered to adjoining property owners by limiting the rights of others to such amount of water taken by the sinking of wells and in other like manner as might be necessary for some useful purpose in connection with the land where they are sunk; that absolute ownership in the holder of the fee of the underground waters should not be recognized, but the right of the landowners to such waters should be exercised with reference to the equal rights of others in their lands.

Lord Wensleydale, who had some doubts on the subject, however, agreed in Chasemore *v.* Richards, and made the judgment of the court unanimous. He inclined to the theory contended for by the plaintiffs that the use to be made of such subterraneous waters by the landowner must be reasonable; that is, confined to the uses of his property and those living thereon. He admitted that if the number of houses erected upon such property had increased so that the quantity of water used by their occupants had been proportionately augmented, even then there could have been no just grounds for complaint; but when water was abstracted for the use of a large district not connected with the estate whereon the well was sunk, he doubted the legality of such acts, but conceded, however, that the abstraction of water for the use of dwellers upon the land whereon the well existed, even though they carried on trades, such as breweries, would still be for their purposes only.

The fallacy of this reasoning lies in the criterion set for a reasonable use. It is not quantity used, but purposes of use. Now, the injury to the neighboring tenant is caused by the quantity abstracted, the purpose of abstraction is immaterial. The argument which permits breweries and like industries to be supplied, however great their consumption may be, loses sight of the cause of the injury.

Taking the instance of the brewery, it is fair to suppose that the water used therein would become a part of its trade

product and would be sent to distant regions for gain, and thereby be abstracted in like manner, as it would be in supplying the inhabitants with pure water for use in like distant regions.

The Pennsylvania case of *Wheatley* v. *Baugh*, 25 *Pa. St.* 528, is an adoption of the English rule. See the later case of *Haldeman* v. *Bruckhart*, 45 *Pa. St.* 514, in which reference is thus made to Wheatley *v.* Baugh. "Undefined water courses there spoken of which a man may not divert to the hurt of an inferior proprietor, are not the hidden streams, of which the owners of the soil through which they pass can have no knowledge until they have been discovered by excavations." . See, also, *Lybe's Appeal*, 106 *Pa. St.* 626.

The rule of reasonable use has been adopted, however, in some states, notably in Massachusetts, *Hart* v. *Jamaica Pond Aqueduct Co.*, 133 *Mass.* 488; in New Hampshire, *Bassett* v. *Salisbury Manufacturing Co.*, 43 *N. H.* 569, and in New York, *Forbell* v. *New York*, 164 *N. Y.* 522.

In certain arid regions the English doctrine has been denied. In *Katz* v. *Walkinshaw*, 141 *Cal.* 116, 141, the court, speaking of the English rule, says:

"Such law as has been made upon the subject comes from countries and climates where water is abundant, and its conservation and economical use of little consequence, as compared with a climate like southern California."

I am inclined to think, however, that the English rule heretofore either adopted or recognized in this state, supported as it is by the great weight of authority in this country, is the better, and for these reasons the judgment of the court below should be affirmed.